BRYAN v. BOARD OF EDUCATION OF THE KENTUCKY CONFERENCE OF THE METHODIST EPISCOPAL CHURCH, SOUTH.

ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 134. Argued and submitted December 6, 1893. — Decided February 5, 1894.

The citizens of Millersburg, Kentucky, raised a fund for the purpose of establishing a collegiate institute in that place or its vicinity, and invited the Kentucky Annual Conference of the Methodist Episcopal Church, South, to take charge of it when established. The invitation was accepted, and the legislature of the State incorporated the institute by an act, one provision in which was a reservation to the legislature of the right to amend or repeal it. Large additions were then made to the fund from other sources, and in 1860 another act was passed incorporating the Board of Education of that Conference of the Methodist Church. In this act, after reciting the raising of the money, and the establishment of the institution at Millersburg, the control of the college and the disposition of the sums raised were placed in the hands of the Conference. This act, also, was passed subject to the right of the legislature to amend or repeal. In 1861, the legislature passed another act, in which, as construed by the courts, power was conferred upon the Conference to remove the college from Millersburg to any other place within the bounds of the Kentucky Annual Conference. Held, that the latter act did not impair any contract created by the former statutes and proceedings.

The Pennsylvania College Cases, 13 Wall. 190 require the affirmance of the decree in the court below in this case.

THE plaintiffs in error, suing on behalf of themselves and other shareholders of the Board of Education of the Kentucky Annual Conference of the Methodist Episcopal Church, South, and of the Millersburg Male and Female Collegiate Institute, brought this suit in equity in the Circuit Court of Bourbon County, Kentucky, against the Board of Education of the Kentucky Annual Conference of the Methodist Episcopal Church, South, and others, to obtain a decree perpetually restraining the defendants from selling or disposing of certain lands and buildings of the above-named Institute, commonly known as the Kentucky Wesleyan College, located at Millersburg, Kentucky, or from removing that college, its capital or property, from that place to Winchester in the same Common-

wealth, or from using the capital or fund of the Institute for any purpose or at any place, except in its conduct and management at Millersburg.

Upon final hearing the bill was dismissed, and that decree was affirmed by the Court of Appeals of Kentucky, the highest court of the Commonwealth. The present writ of error questions the correctness of the decree of affirmance upon the ground, among others, that it gives effect to legislative enactments which, it is alleged, impair the obligation of a contract, in which the plaintiffs and those in whose behalf they sue have an interest, for the permanent location and maintenance of the college at Millersburg.

The facts relating to the alleged contract, and to the Federal question suggested by the legislation referred to, will sufficiently appear in the following statement:

At a meeting of the citizens of Millersburg, held on the 4th day of January, 1858, these resolutions were adopted:

"Whereas it is proposed to purchase ground and erect buildings for an institution of learning and boarding-house, the whole to cost about fifteen thousand dollars; and whereas it is believed to be indispensable to the success of educational enterprises that they may be under the supervision of some denomination: Therefore,

"*Resolved*, That we promise and pledge ourselves for the amount subscribed to secure a male and female collegiate institute in Millersburg or its immediate vicinity, on the following basis, to wit: 1, that it be an Institute for the Covington district, Kentucky Conference, and be under the control of the Methodist Episcopal Church, South; 2, the trustees and building committee be appointed by the Quarterly Conference of the Millersburg station, the former to be subject to the approval of the Kentucky conference; 3, it shall be upon the joint stock plan, the shares to be $25 each, and to be subject to sale or transfer, but not to bear interest; 4, in case the said church fail to sustain the Institute, and it shall from any cause be discontinued, then the property is to revert to the stockholders *pro rata;* 5, the stock subscribed shall be paid to the building committee on the following terms: one-

third when the buildings are put under contract, one-third when they are covered in and floors laid, and one-third six months thereafter."

For the purpose of accomplishing these objects, the Millersburg Male and Female Collegiate Institute was incorporated by an act of the legislature of Kentucky, approved February 16, 1858, Laws Ky. 1858, c. 689, the preamble of which recited that " divers citizens in and near the town of Millersburg, in the county of Bourbon, have subscribed a considerable sum of money for the purpose of erecting in or near said town a seminary of learning, to be under the control and supervision of the Kentucky Annual Conference of the Methodist Episcopal Church, South, to the extent hereinafter provided." The act made certain trustees and their successors in office capable of purchasing and holding any lands, tenements, goods, chattels, and money, not exceeding $50,000 in value, that should be purchased, granted, or devised to the use of the institution. It was provided that the trustees might receive additional subscriptions and donations in aid of the seminary, and should be selected, from time to time, by the Kentucky Annual Conference of the Methodist Episcopal Church, South, upon the nomination of the Millersburg station of that church. The fourth section of the act is as follows: " All persons who shall subscribe twenty-five dollars or more in aid of said Institute shall be deemed stockholders therein, said sum to constitute a share. And if the said Methodist Church shall ever relinquish or surrender, or cease to exercise a control over said Institute, then, and in that case, its control and management shall revert to and vest in said stockholders, who may, at a meeting for that purpose called, proceed to elect a board of trustees ; and if said corporation shall cease to exist, or be dissolved, or its charter surrendered or repealed, all its property of every kind or description shall vest in said stockholders."

This act, it was declared, should take effect from its passage, " but the legislature reserves the right to amend or repeal the same."

At the meeting of the Kentucky Annual Conference, held

in Millersburg, in September, 1858, the trustees of the Institute presented a memorial, stating that it had secured a charter for a collegiate institute to be held and controlled, as in its charter provided, by that Conference; had obtained a subscription of $7500; and had purchased a suitable piece of land, and taken steps to have all necessary buildings erected on it. The Conference having been asked to accept the subscription, grounds, etc., upon the terms set forth in the charter of the Institute, the memorial was referred to a committee, which reported as follows: "1, that we accept the Institute upon the terms set forth in the charter; 2, that we request the presiding bishop to appoint the preacher of Millersburg station agent to raise the sum of $10,000 for our educational fund; 3, that the sum of $10,000, when secured, be subscribed as the stock of this Conference in the Institute; 4, that we, the members of this Conference, being deeply impressed with the sense of our educational necessities, do hereby pledge ourselves personally to the support of this institution, and we will afford every facility in our power to the agent in raising the above $10,000."

The Conference approved the report of the committee. But having expressed its belief that harmony of action in that body would be secured if the charter of the Institute were amended so as to make it exclusively a male school, with college privileges, a meeting of the stockholders and friends of the Institute was held, at which it was resolved: "1, that we, as stockholders in the Institute, will unite in application to the legislature to so amend the charter as to make it a first-class male college; 2, that we will raise our subscription to $10,000, and that we will use our best efforts to advance and sustain the enterprise, upon the condition that the Kentucky Annual Conference of the Methodist Episcopal Church, South, will appoint a special agent to raise an additional sum of $10,000; and further, that said Conference, in good faith, pledges itself to aid in the erection of suitable buildings, and to take the proper steps to endow the college as soon as practicable." These proceedings were approved by the Conference.

On the 30th day of September, 1858, at a meeting in Lex-

ington, Kentucky, of the Board of Education, which had been constituted by the Conference at its meeting in Millersburg, but had not then become incorporated, it was resolved: "1, that we believe that $200,000 will be ultimately required to establish and sustain in the best manner a first-class college, and that we proceed at once to raise one-half of that amount; 2, that no part of the capital raised for the educational fund shall ever be appropriated to the payment of the salaries of the professors and other teachers, or for any contingent expenses whatever, and that only $10,000 of that fund, as already pledged by the Conference, shall be appropriated toward the erection of the college buildings; 3, that no part of the proceeds of the capital shall be used for any purpose whatever until, in the judgment of the Board of Education and the trustees of the college, it is annually sufficient to support three professors; 4, that we issue scholarships of the value of $500 each, to be perpetual and transferable, and to entitle the holder to tuition in either the preparatory department or the college proper, in any studies necessary to graduation; 5, that we issue scholarships of the value of $100 each, to terminate in fifty years from the time of the opening of the college, not to be transferable, and to entitle the holder to tuition only in the college proper, and in such studies only as may be necessary to graduation — in other respects, they are to be similar to the scholarships of Asbury University, of Greencastle, Indiana; 6, that we issue scholarships to the value of $50 each, entitling the holder to five years' tuition at any time within fifty years from the time of the opening of the college, in any of the classes of the college, in the studies necessary to graduation, but not to be transferable; 7, that if the original stockholders of the Millersburg Male and Female Collegiate Institute will raise in Bourbon County, and in that portion of Nicholas County lying in the vicinity of Millersburg, $10,000 in addition to the $10,000 pledged by them, the entire amount of $20,000 thus raised to be invested in the erection of the buildings, we will issue scholarships for the said $20,000 on the same terms as to others, provided that their amount of stock in that case be surrendered, in lieu of said issue of scholarships, to the Ken-

tucky Annual Conference of the Methodist Episcopal Church, South, to be held by said conference as part of the educational fund; 8, that the treasurer of the educational fund be instructed to pay over moneys coming into his hands, as they may be needed, so soon as the $10,000, already pledged by the stockholders, shall have been secured, provided that he shall, in so doing, be governed by the action of the conference and the other part of these proceedings; 9, that any individual who shall endow a professorship shall have the privilege of naming it."

The above proposition was acceded to by stockholders at a meeting held in October, 1858, to consider the subject, and scholarships were issued to those making subscriptions or donations. A certificate of perpetual scholarship recited that the person to whom it was issued had, by payment of the sum therein named "to the treasurer of the Educational Fund of the Kentucky Annual Conference of the Methodist Episcopal Church, South, purchased" the same "in the college or university to be established by said conference at Millersburg, Kentucky," under certain specified limitations. The certificate of a fifty-year scholarship contained similar recitals, accompanied by numerous conditions, that need not be here repeated. The notes executed for the scholarships were in the following form:. "$500.	Bourbon County, Kentucky, ———, 18—.
—— year after date I promise to pay to the order of ———, treasurer of the Educational Fund of the Kentucky Annual Conference of the Methodist Episcopal Church, South, five hundred dollars, this being the —— note in —— payment for a scholarship in the college or university to be established by said Conference." Some of the notes had in them these words: "In the college or university now established by said Conference.". Upon delivery by donors or subscribers of their notes, the agent executed a receipt in the following form: "Received of (William M. Miller), five hundred dollars ($500), and his note for five hundred dollars ($500), payable in one year from the —— day of —— 18—, to ———, treasurer of the Educational Fund of the Kentucky Annual Conference of the Methodist Episcopal Church, South, which, when paid,

will entitle him to two perpetual scholarships in the college or university established by said Conference. —— County, Kentucky, ——, 18—."

While certificates of scholarships were being issued, the buildings were in process of erection at Millersburg, and by November 23, 1859, nearly $60,000 had been donated in cash and notes, of which about $20,000 had been expended on the buildings, leaving only a small sum to be applied for their completion.

On the 12th of January, 1860, the legislature of Kentucky passed an act entitled "An act to incorporate the Board of Education of the Kentucky Annual Conference of the Methodist Episcopal Church, South," 1 Laws 1860, c. 39, the preamble reciting that "the Kentucky Conference of the Methodist Episcopal Church, South, have resolved to form an Educational Fund and establish a college for the promotion of literature, science, morality, and religion within the limits of said Conference; and having, in fact, secured the sum of fifty-seven thousand dollars in cash and in good and reliable notes, and located an institution at Millersburg, Bourbon County, which is now ready for occupancy: now, in order to give full and complete legal effect thereto," etc. This act authorized the Board to make by-laws and ordinances for the proper conduct and government of the college, to elect its president and faculty, to establish, change, or abolish professorships as the exigencies of the college might require, and to perform all acts, not inconsistent with the constitution or statutes of the State, that were necessary or expedient in sustaining the Educational Fund of the Conference, and for the proper conduct of the college. The board was required to meet at the time of the commencement of the college at Millersburg, and at such other times as it might determine. The money paid into the hands of the treasurer, as the Educational Fund, was directed to be invested in Kentucky state bonds, county bonds, or safe and profitable stocks, as the board might determine, except the amount necessary "to pay for the present college building." By the 11th section, the act incorporating the Millersburg Male and Female Collegiate Institute, approved February

646 OCTOBER TERM, 1893.

16, 1858, was repealed. And, by the 12th section, the right to amend or repeal the act of 1860 was reserved.

By an act of the Kentucky legislature, approved September 17, 1861, amendatory of the act incorporating the Board of Education of the Kentucky Annual Conference of the Methodist Episcopal Church, South, it was provided: "§ 1. That it shall and may be lawful for the trustees of Millersburg Male and Female Collegiate Institute, who were in office on the 12th day of January, 1860, when the act incorporating said institute was repealed, or their survivors, to convey, by deed, to the Board of Education of the Kentucky Annual Conference of the Methodist Episcopal Church, South, the property held by said trustees in and near the town of Millersburg, for the purpose of carrying into effect any contract made by said trustees or stockholders of said institute with said board, and their conveyance, recorded in the proper office, shall be effectual to pass the title of said property to said board and their successors. § 2. Nothing contained in the act of the general assembly incorporating said board, approved January 12, 1860, shall be construed so as to prevent or hinder said board, or their successors, from removing the seat of the college from Millersburg to any other place in the bounds of the Kentucky annual conference. § 3. This act to be in force from its passage." Laws 1861, 2, 3; Private Laws, c. 8, p. 4.

This act was accepted by the Annual Conference by formal action taken September 25, 1861, and on the 4th day of November, 1861, nearly twenty-seven years before this suit was brought, the trustees of the Millersburg Male and Female College conveyed to the Board of Education, and their successors in office, the grounds on which the college buildings were erected, "for the benefit of the Educational Fund of the Kentucky Conference of the Methodist Episcopal Church, South, forever, to be held and used and disposed of in such way as the charter of said Board of Education may direct."

*Mr. Thomas F. Hargis*, for plaintiff in error, submitted on his brief, in which he cited, to the point that there was a contract between the founders of the college and the conference,

to keep and maintain the institution at Millersburg : _Hascall_ v. _Madison University_, 8 Barb. 174 ; _Chambers_ v. _Baptist Education Society_, 1 B. Mon. 215 ; _Louisville_ v. _University of Louisville_, 15 B. Mon. 142 ; _State_ v. _Adams_, 44 Missouri, 570 ; _Allen_ v. _McKeen_, 1 Sumner, 276 ; _Philips_ v. _Bury_, 2 T. R. 345 ; _Murdock's Appeal_, 7 Pick. 303 ; _Sage_ v. _Dillard_, 15 B. Mon. 340, 356 ; _Kean_ v. _Johnson_, 1 Stockton, (9 N. J. Eq.) 401.

_Mr. D. M. Thornton_ and _Mr. J. M. Wilson_, (with whom was _Mr. Samuel Shellabarger_ on the brief,) for defendants in error.

Mr. Justice Harlan, after stating the case, delivered the opinion of the court.

The plaintiffs contend that, notwithstanding the act of 1858 reserved the right to amend or repeal the charter of the Millersburg Male and Female Collegiate Institute, the 11th section of the act of 1860 repealing the act of 1858, incorporating the Millersburg Male and Female Collegiate Institute, was repugnant to that provision of the constitution of Kentucky, then in force, declaring that "no law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title." Art. II., § 37. This contention was sustained by the Court of Appeals of Kentucky, upon the ground that the subject of the repeal of the charter of 1858 was not expressed in the title of the act of 1860. And, in our consideration of the principal question in the case, we will assume, without discussion, that the charter of the Institute was not repealed by the act of 1860.

But the court below further said, in the same connection, that the repeal of the charter of the college "was not actually necessary, because the corporation created by it practically ceased to exist after the contract made between the original stockholders and Board of Education, whereby the latter acquired for use of the Kentucky Wesleyan College possession of and equitable title to all property of the Millersburg Male and Female Collegiate Institute, and the trustees thereof were deprived of their function and divested of every right except

the naked legal title; and as section 1 of the act of September 17, 1861, merely empowered those trustees to convey that property to the Board of Education, which they might have been coerced to do by a court of equity, no injury resulted from it." But plaintiffs in error insist that the first section of the act of 1861 impaired the obligation of the contract in question.

The view taken by the court below upon this point is, in our judgment, entirely sound. From the inception of the scheme to establish an educational institution at Millersburg, it was intended that it should be under the control of the Methodist Episcopal Church, South, represented by its Kentucky Annual Conference. This purpose was distinctly recognized in the charter of the Institute, which gave authority to that Conference, upon nominations by the Millersburg station of that Church, to select the trustees of the Institute from time to time, and declared that if the Methodist Church should ever relinquish or surrender, or cease to exercise a control over, the Institute, then its control and management should revert to and vest in its stockholders, who were authorized, at a meeting called for that purpose, to elect trustees. The trustees of the Institute, therefore, acted within the authority conferred upon them, when, in September, 1858, they asked the Conference to accept the subscription, grounds, etc., that had been obtained for the Institute. The Conference did formally accept the Institute upon the terms set forth in its charter, and by such acceptance acquired full control of the college. The court below correctly held that after the control of the Institute had been thus transferred to the Conference, the trustees had no other functions to perform, in respect to the property of the college, except to hold the naked legal title. Why, then, was it not competent for the General Assembly to invest the trustees of the Institute — as was done by the first section of the act of 1861 — with authority to convey to the Board of Education the property held by them for the purpose of carrying into effect any contract made by them or the stockholders of the Institute with that Board? It must be remembered that the right to amend or repeal was reserved to the General Assembly in the charter of the Institute granted in 1858. The

transfer of the naked legal title from the trustees of the Institute to the Board of Education did not take from the Institute any substantial right, but was in execution of the purpose to put the college and its property wholly under the control and management of the Kentucky Annual Conference of the Methodist Church, South. The deed from the trustees stated that the college buildings had been erected for the benefit of the Educational Fund of the Kentucky Conference of the Methodist Episcopal Church, South, forever to be held, used, and disposed of in such way as the charter of that Board might direct. That charter, we have seen, was granted to give legal effect to the purpose of the Conference, previously avowed, to form an Educational Fund and establish a college for the promotion of literature, science, morality, and religion within its bounds, to which end a large sum in cash and notes had been secured, and an institution located at Millersburg, then ready for occupancy. If the first section of the act of September 17, 1861, had contemplated any diversion of the property and funds of the Institute from the purposes for which they were acquired, and for which, by its charter, they could be used, a different and more serious question would have arisen.

This brings us to the examination of the second section of the act of 1861, which provided that nothing in the charter of the Board of Education " shall be construed so as to prevent or hinder said Board or their successors from removing the seat of the college from Millersburg to any other place within the bounds of the Kentucky Annual Conference." The contention of the plaintiffs is that there was and is a contract, the benefits of which they can rightfully claim, that the Institute should remain permanently at Millersburg; and that, if the second section of the act of 1861 contains a grant of power to remove the Institute from that town, it was void as impairing the obligation of the contract.

Literally interpreted, the second section of the act of 1861 would be held to do nothing more than prescribe a rule for the interpretation of a previous legislative enactment; and, so interpreted, it would be inoperative as an act of legislation under those provisions of the constitution of Kentucky, then

in force, confiding the powers of government to three distinct departments, legislative, executive, and judicial, and declaring that no person or collection of persons, being of one of those departments, should exercise any power properly belonging to either of the others, except in the instances expressly directed or permitted. Art. I, §§ 1, 2. But the Court of Appeals of Kentucky, regarding substance rather than form, held that the intention of the General Assembly, by the second section of the act of 1861, was to confer upon the Board of Education a power not expressly granted by the act of 1860, namely, the power of removing the seat of the college from Millersburg to any other place in the bounds of the Kentucky Annual Conference. We assume that the act means what the court below said it meant, in view of the constitution of the State. It must, therefore, be taken, in our examination of the question as to the repugnancy of the second section of the act of 1861 to the Constitution of the United States, that it was intended by the General Assembly of Kentucky to give the Board of Education authority to remove the college and its capital and funds from Millersburg to some other place within the bounds of the Kentucky Annual Conference. Did the act, thus interpreted, impair the obligation of any contract that the plaintiffs in error had in reference to that college? It certainly did, if the alleged contract forbade the removal of the Institute from Millersburg, except with the assent of the plaintiffs and those in whose behalf they sue. So that it is necessary to inquire as to the existence and effect of the alleged contract. And that question must be determined by this court upon its own judgment, independently of any adjudication by the state court. *Jefferson Bank* v. *Skelly,* 1 Black, 436, 443; *Wright* v. *Nagle,* 101 U. S. 791, 794; *Louisville & Nashville Railroad Co.* v. *Palmes,* 109 U. S. 244, 254, 257; *Louisville Gas Co.* v. *Citizens' Gas Co.,* 115 U. S. 683, 697; *Vicksburg &c. Railroad Co.* v. *Dennis,* 116 U. S. 665, 667. If there was no such contract, as is alleged, then no right, secured by the National Constitution, has been denied by the decree below.

The argument in support of the existence of the alleged contract rests upon the words of various documents, showing

that the original purpose of those who were instrumental in establishing this Institute was to have it located at Millersburg. Undoubtedly, those persons were moved to act, in some degree, by the belief that the seat of the proposed college would be at Millersburg. That belief is disclosed in the resolutions adopted by the citizens of Millersburg at the meeting of January 4, 1858. It is also expressed in the charter of the Institute granted in the same year, reciting that money had been subscribed for the purpose of erecting in or near said town a seminary of learning. It is again expressed in the certificates of perpetual scholarships issued under the authority of the Conference. It is further expressed in the charter of the Board of Education of 1860, referring to the college as having been "located" at Millersburg, with buildings then ready for occupancy. And it is equally manifest that when that charter was granted, the Conference believed that the ends proposed to be accomplished by the establishment of the institution, namely, the promotion, within its bounds, of literature, science, morality, and religion, could be accomplished by an institute located at Millersburg. It is equally true, upon the record before us, that the Conference was not wanting in earnest, persistent efforts to sustain the Institute at Millersburg. But that body, in its wisdom, determined that the objects in view could be best accomplished by removing the college to some other place. And we are of opinion that its removal to Winchester would not be in excess of its authority.

At the meeting of citizens of Millersburg, held in 1858, it was declared that the Institute should be under the control of the Methodist Episcopal Church, South; and, although the object avowed was to secure a collegiate institute at Millersburg or in its immediate vicinity, the only condition named in the resolution passed at that meeting, upon which the property should revert to the stockholders was the failure of the church to sustain the Institute, or its discontinuance from any cause. And, in the charter of the Institute, it is provided that if "the Methodist Church shall ever relinquish or surrender, or cease to exercise a control over said Institute, then, and in that case, its control and management shall revert to and vest in said

stockholders, who may, at a meeting for that purpose called, proceed to elect a board of trustees; and if said corporation shall cease to exist, or be dissolved, or its charter surrendered or repealed, all its property of every kind or description shall vest in said stockholders." It is a significant fact that the *permanent* location of the Institute at Millersburg was not made in terms by the resolutions of the citizens' meeting or by the charter of the college a condition upon which the control of the Institute and its property should remain with the Conference. The Methodist Episcopal Church, South, as represented by the Kentucky Annual Conference, has not relinquished, surrendered, or ceased to exercise control of the Institute, and, therefore, its control and management has not reverted to stockholders through trustees of their own selection. The Institute has not been discontinued; nor has the corporation ceased, in law, to exist; nor has its charter been surrendered or repealed; and, therefore, its property has not, in any view of the facts, or of the legislation in question, vested in stockholders.

The primary object of those who first moved in this matter, namely, to secure the establishment of an institution of learning under the control of the Kentucky Conference of the Methodist Episcopal Church, South, has not been overlooked or ignored in anything that has been done or proposed to be done. The belief of those who subscribed to the stock of the Institute, or accepted scholarships after the Institute passed under the control of the Conference, through its Board of Education, that the Institute would remain permanently at Millersburg, cannot be regarded as equivalent to a contract or absolute agreement that prevents the Conference from removing the Institute to another place, if it deems such a course to be best for the cause of education and morality. It is not the province of this court to sit in judgment upon the propriety of the course pursued by that body. We can only deal with the question of contract. And that question cannot depend upon any consideration of what, under all the circumstances, is fair and just as between the Conference and those citizens of Millersburg and vicinity who may have believed,

or expected, when making their subscriptions or giving their support to the institution, that it would always be maintained at that place. This court, in determining the Federal question involved, can only look at the question of the power of the General Assembly of Kentucky to authorize the removal of the Institute to another place within the bounds of the Conference. In the absence of a binding agreement, upon the part of the Conference or those representing it, that the Institute should remain permanently at Millersburg, even if the object of its original establishment could not be accomplished by keeping it there, our duty is to adjudge, without reference to considerations of abstract justice or equity, that the legislation in question is not repugnant to the Constitution of the United States.

In the brief of learned counsel for the plaintiffs are cited numerous authorities which, it is supposed, require a different conclusion from that announced by us.

One of the cases much relied on is *Sage* v. *Dillard*, 15 B. Mon. 340, 360, 361. The question there determined is indicated in the following extract from the opinion of the Court of Appeals of Kentucky: " In this case it appears that the original founders, or endowers, of the Institute, were willing to entrust their charity to the care and management of the original trustees, and such others, of course, as might be necessary, in their opinion, to effectuate the objects of the charity. To trustees, of their own selection, they confided the bounty which they bestowed for a great, a praiseworthy, and a noble purpose. In the hands of these men, and others of *their* choice, they entrusted the management and control of an institution which, by their munificence, was brought into being, and into which their beneficence has infused energy and usefulness. This charity has grown into a valuable estate, and sustains an institution which was designed to promote education in the Christian Scriptures, and qualify a Baptist ministry to disseminate religious knowledge in the West. The object is a laudable one; and can it be that the legislature, in retaining the right to ' alter ' or ' amend ' the charter, retained the right to take the supervision and control of this

opulent charity out of the hands of those to whose care and oversight the founders confided it, and place it in the hands of strangers, who never breathed, perhaps, a single breath of vitality into this institution, either to impart to it life or growth? We think not."

Another case cited by plaintiffs is, *City of Louisville* v. *Pres. & Trustees of University of Louisville*, 15 B. Mon. 642, 687, 694. The principal question in that case was as to the validity of an amendment of the charter of the University of Louisville, giving to the city of Louisville, one of the donors of the institution, to the exclusion of other donors, the power of electing trustees of the University. The court, as counsel correctly observe, held that though a part of the funds were granted by the city, the charter constituted a contract, by which all the donors, the trustees, and the State were bound, and the obligation of which could not be impaired by an act passed under a reserved power to alter, amend, or repeal. Chief Justice Marshall, speaking for the Court of Appeals of Kentucky, said, among other things, that "it would at least seem to be just that the donors should have a right to insist that, as long as their donation is retained, it shall not, even under the authority of the State, be diverted from the uses stipulated in the charter, and the right should be transmissible as incident to the reversionary interests, and to the contract of donation. . . . We are of opinion, therefore, upon the ground of authority as well as of reason, that the original charter of the University of Louisville creates a private corporation, which is protected by that clause of the Constitution of the United States which prohibits the enactment of laws impairing the obligation of contracts; and that so much of the amended charter of the city of Louisville of 1861, as relates to the existing corporation and charter of the university, and vests, or professes to vest, in a new corporation, or in new trustees, the property and privileges of the original corporation, is in violation of that constitutional prohibition, and consequently void."

Our attention has also been called to the case of *State* v. *Adams*, 44 Missouri, 571, 577, relating to the charter of St.

Charles College, a corporation of Missouri.  That charter, in conformity with the wishes of its founder, declared the college to be an institution purely literary, affording instruction in ancient and modern languages, and in the sciences and the liberal arts, and not including or supporting by its funds any department for instruction in systematic or polemic theology, nor instituting any regulations which should render a place in its classes offensive " to reasonable, liberal-minded persons, whatever might be their religious views."  By a legislative amendment of the charter, it was provided that the concurrence of the Missouri Annual Conference of the Methodist Episcopal Church, South, should be requisite in filling vacancies on the board of curators, upon the Conference affording satisfactory assurances for the maintenance and endowment of the college.  One of the questions in the case was whether this amendment was not void as impairing the obligation of the contract created by the original charter.  The Supreme Court of Missouri, referring to the provisions of the original charter, said : " It would have been difficult to more emphatically provide for the exclusion of special or denominational religious influences.  The declared objects and principles of the foundation are inconsistent with it, and the choice of future curators is to be uncontrolled by any ecclesiastical body or personage.  We do not, hence, suppose that the founder intended to exclude all influence from, or instruction in, the great principles of Christian ethics, the basis of all character, the foundation of good citizenship and just government, and which are professedly adopted by men of all creeds; but he did intend to prevent the institution from becoming in any special sense a theological or religious school.  The amendment in the charter, by requiring the concurrence in the choice of the curators of an ecclesiastical body representing one of the religious denominations of the State, endangers, in this regard, the principles of the foundation; and even if it did not, it changes the character of the administration of the trust, hinders the free choice of their successors, according to the will of the founder, by the men to whom he had entrusted his bounty, and essentially impairs the contract under which

he advanced it." For these reasons the amendment was held to be a violation of the contract embraced in the charter.

Reference has been made to *Allen* v. *McKean*, 1 Sumner, 276, 305, which involved the validity of an act of the legislature of Maine relating to Bowdoin College, of which the Commonwealth of Massachusetts was the founder. By the Act of Separation of Maine from Massachusetts, the powers and privileges of the president, trustees, and overseers of the college were guaranteed under its charter, so that they could not be altered, limited, annulled, or restrained except by judicial process, according to the principles of law, unless with the assent of both States. Massachusetts subsequently, by formal Resolve, gave its assent to any alteration or modification of the act relating to the college, not affecting the rights or interests of that Commonwealth, which the authorities of the college corporation might make. with the consent of the legislature of Maine. Alluding to the Resolve of Massachusetts, and considering its scope and effect, Mr. Justice Story said : " Nothing is clearer in point of law than the right of a founder to have his visitorial power exclusively exercised by the very functionaries in whom he has vested it. It is the very substratum of his dotation. This is not all. The founder has a right to have the statutes of his foundation, as to the powers of the trustees, strictly adhered to, except so far as he has consented to any alteration of them. But an authority to alter or modify those powers can never be fairly construed into an authority to take them away from his trustees, and confer the same powers on other persons. My view of the resolve, therefore, is, that it authorizes no alterations or modifications of the college charter which shall divert the funds of the founder from their original objects . . . and, *a fortiori*, that it does not justify the transfer of these powers from the trustees to any other persons not in privity with them. It does not authorize the legislature of Maine to assume to itself the powers of the trustees or overseers, or either of them, or to appoint new trustees or overseers ; for that would affect the rights and interests of the founder, who has a right to select his own administrators of his own bounty in perpetuity."

Neither of those cases has any application to the one before us. There has been no diversion of the funds raised for this Institute. From the beginning, the purpose was to establish an institution to be under the control and supervision of some religious denomination, and the denomination selected was the Methodist Episcopal Church, South, represented by the Kentucky Annual Conference. Nor has the legislature assumed to make any material change in its control and management. The trustees, as the charter of the Institute required, are selected by that Conference. The question here relates simply to the power of removing the Institute from the place of its origin to another place within the bounds of that Conference. There is no question of diversion of funds, or of change of control and management. It is clear that the above cases are wholly inapplicable to the present controversy.

The case more directly in point than any one to which our attention has been called is the *Pennsylvania College Cases,* 13 Wall. 190. It resembles the present one in many important particulars. The principles which, in that case, sustained the validity of the legislation of Pennsylvania relating to the colleges at Canonsburg and Washington lead to an affirmance of the decree below.

We concur with the Court of Appeals of Kentucky in saying that neither the contract between the original stockholders and Board of Education nor the act of 1860 contains an express condition that the title of the property which became part of the endowment fund was to be held upon condition that the college be forever conducted and maintained at Millersburg, and nowhere else within the territorial limits of the Annual Conference; that such condition exists, if at all, by implication only; that the law does not presume a party entitled to a right or benefit of reservation claimed under contract in the absence of an express stipulation, except such as reason and justice dictates; that not only those residing elsewhere, but as well residents of Millersburg and vicinity, must be presumed to have regarded the establishment and successful maintenance of a first-class college under the patronage and control of the Annual Conference as the first and

main consideration for the outlay of money made, and the particular locality as of secondary importance; and, therefore, all that can be reasonably implied in behalf of the citizens of Millersburg is that they expected and believed that the successful operation of the institution would prove compatible with the continuance of it at that place. To now imply anything else or more, that court well says, would not only involve the absurdity of hazarding or sacrificing an institution of learning, the successful and useful operation of which within the bounds of the Conference was clearly the main inducement for the great outlay already made, "but be in disregard of the rights and interests of those residing elsewhere than at Millersburg, who have contributed either by purchasing scholarships or donations, very much more than has been raised at that place. There is mention made in the act of 1860, and also in the certificates of scholarships, of the college being established at Millersburg, but the language used does not import an agreement that it shall permanently remain there; on the contrary, we think it should, as it can fairly, be interpreted as merely descriptive of the institution. In our opinion, therefore, there exists no contract or undertaking, express or implied, for the continuance of the institution at Millersburg any longer than its useful and successful operation requires."

It results from these views that the decree below does not give effect to an act of the General Assembly of Kentucky that is repugnant to the Constitution of the United States. The decree must, therefore, be

*Affirmed.*