CITY OF PATERSON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, *ET AL.*, PLAINTIFFS, v. THE PATERSON GENERAL HOSPITAL, A NEW JERSEY CORPORATION, *ET AL.*, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided October 25, 1967.

*Mr. Adolph A. Romei* for plaintiffs.

*Mr. John W. Griggs* for defendants (*Messrs. Morrison, Lloyd & Griggs,* attorneys).

*Mr. Arthur J. Sills,* Attorney General of State of New Jersey.

MOUNTAIN, J. S. C. Plaintiffs seek to prevent defendant Paterson General Hospital from changing the location of the hospital from its present site on Market Street in Paterson to a tract of land about $3\frac{1}{2}$ miles away in Wayne Township. This defendant wishes to sell its land and buildings in Paterson and construct new facilities on the Wayne site which it has recently purchased. Plaintiffs' sole contention is that this defendant is a charitable trust created for the purpose of ministering to the residents and citizens of the City of Paterson, especially the sick poor, such aid to be administered in physical facilities located within the municipal limits of the city of Paterson. Plaintiffs have joined the members of the board of managers (now trustees) of the hospital as individual defendants. Throughout this opinion, however, the word "defendant" will refer only to the Paterson General Hospital.

By special act of the Legislature adopted April 5, 1871 (*L.* 1871, *c.* 480) a corporation came into being known as the Ladies' Hospital Association of the City of Paterson. The charter stated that the corporation was formed "for the purpose of establishing and maintaining a public hospital in the city of Paterson." On June 27, 1887, pursuant to *L.* 1887, *c.* 17, the name of the corporation was changed from the Ladies' Hospital Association of the City of Paterson to the Paterson General Hospital Association, the hospital itself thenceforth to be designated "The Paterson General Hospital." On January 24, 1948 the Paterson General Hospital Association was reincorporated under the provisions of *Title* 15 of the *Revised Statutes,* "Corporations and Associations Not For Profit." The certificate of incorporation filed at that time stated that thenceforth the name of the corporation

would be The Paterson General Hospital. The purposes of the organization were stated as follows:

"(1) To maintain a Hospital for the care of persons of any creed, nationality or color, suffering from illnesses or disabilities which require that the patients receive hospital care;

(2) To carry on any educational activities related to rendering care to the sick and injured or the promotion of health, which in the opinion of the Board of Managers may be justified by the facilities, personnel, funds or other requirements that are or can be made available;

(3) To promote and carry on scientific research related to the care of the sick and injured insofar as, in the opinion of the Board of Managers, such research can be carried on in connection with the Hospital;

(4) To participate, so far as circumstances may warrant, in any activity designed and carried on to promote the general health of the community."

The office of the corporation as well as the place where it was to be located and its activities conducted was to continue to be No. 528 Market Street, Paterson, New Jersey. On February 18, 1966 the certificate of incorporation was amended to permit the hospital to continue its activities either in the City of Paterson or in the Township of Wayne. On January 10, 1966 this suit was instituted and at the same time an order was entered, later slightly modified, restraining the defendants from disposing of the presently existing hospital facilities and requiring the continued operation of the hospital at its present location pending final hearing.

As set forth above, plaintiffs' contention is that defendant is and at all times during its existence has been a charitable trust; that the purpose, or at least the principal purpose, of the trust is and at all times has been to minister to the needs of the citizens and residents of the City of Paterson, especially the sick poor; that a further condition of the trust is and at all times has been that the hospital's physical facilities be located within the municipal limits of the City of Paterson. Defendant, on the other hand, while of course conceding that it is a charitable corporation, denies that it is or ever has been

a charitable trust. It points to the fact that during the whole of its existence it has been a corporation, that its reincorporation under *Title* 15 in 1948 was undertaken pursuant to specific statutory authority (*N. J. S.* 15:1–12), and asserts that during its entire existence it has been subject to and governed by the laws applicable to corporations, charitable in nature, rather than by laws applicable to charitable trusts.

To what extent a charitable corporation is to be governed by laws applicable to charitable trusts is a vexed question to which the authorities give irreconcilable answers. See Note, "The Charitable Corporation," 64 *Harv. L. Rev.* 1168, 1171 (1951); Blackwell, "The Charitable Corporation and the Charitable Trust," 24 *Wash. U. L. Q.* 1, 2–4 (1938); 4 *Scott on Trusts* (*2d ed.*), 2559; 2 *Restatement, Trusts 2d*, 211.

█ In my opinion defendant is not, strictly speaking, a charitable trust. It is, rather, a charitable corporation, governed by the law applicable to charitable corporations. To some extent this body of doctrine has its roots in the law of trusts, to some extent in the law of corporations; to some extent it may partake of both or indeed be *sui generis.*

To return then to the point in issue, we are concerned here to determine whether a charitable corporation, formed for the purpose of maintaining a public hospital in the City of Paterson, is entitled to remove its hospital facilities, in the manner here contemplated, to a closely adjacent municipality where it would continue to render hospital services. I believe defendant has a legal right to do this in the manner proposed. Plaintiffs have argued, and have supported their argument with a mass of evidence, that the original incorporators and initial benefactors were Patersonians, that throughout the history of the hospital it has been largely supported by contributors resident within the city, and that its medical staff, at least at one time, was confined to physicians who lived in Paterson. From this and other evidence they ask the court to infer that the intention of the original incorporators and donors was to establish and support an institution that would forever be physically located within prescribed municipal

boundaries, and then to determine as a matter of law that defendant corporation can never physically leave these municipal precincts. I cannot infer an intention so parochial, nor do I agree that such is the law. In my opinion the intention of the original incorporators and donors was to create a hospital that would minister to the needs of the citizens and residents of the City of Paterson *and its environs,* and that would furthermore stand ready to offer its services and facilities to all who should seek its help regardless of race, creed or *residence.* Such has been the policy followed by those to whom its management has been entrusted and such has been its history of long and useful service. Joseph C. Bamford, who was president of the hospital from 1945 until 1963, testified that it had always been the purpose of the hospital to serve the sick poor of the City of Paterson and its environs. Its services and facilities have always been available to all who were in need, regardless of residence. According to the most recent figures available, about 46% of all patients come from surrounding areas and places other than Paterson. This history of service rendered indiscriminately throughout the years clearly bespeaks an underlying charitable intent no less unconfined.

But if I am wrong as to the intention of the original incorporators and donors, and if their intention was exactly as urged by plaintiffs, yet it is my belief that defendant is still entitled to do what it seeks to do. This charitable corporation, like most others, holds property for a particular charitable purpose, here the maintenance and operation of a hospital. It was originally provided that the institution should be located in Paterson, and presumably it was understood, as has indeed been the fact, that it would primarily minister to the hospital needs of the community in which it was located. Now, for reasons set forth below, the trustees believe it will be in the best interests of the hospital to move its physical plant a distance of a few miles to a site which happens to be outside the municipal limits of the city of Paterson. Even though it be conceded *arguendo* that we should accord to the

written words of the charter their literal meaning—that the hospital be established and maintained within the limits of the City of Paterson—yet I believe the trustees now have the right to alter the hospital's location in the manner proposed, and that the clear weight of authority supports such a conclusion.

With respect to the right to modify the charter powers of a charitable corporation it has been said,

"Where there is a general statutory authority allowing amendment of the corporate charter, the corporation and its board of trustees are the proper parties to institute the amendment process. Donors, who are generally considered to have surrendered all their rights, and beneficiaries, who are of necessity an indefinite group without the ability to act effectively, lack this power. Allowing amendment at the instigation of the corporation alone has been justified on the ground that the charity in effect represents the interest of the donors, and that the interest of the beneficiaries is protected by the consent of either the corporation or the state. However, such reasoning seems unnecessary to justify changes which are actually allowed because of society's interest in the efficient utilization of property held for charitable purposes. Although the required corporate action for amendment is normally taken by the trustees, consent of members or visitors should be necessary, just as is stockholder consent, when they exercise voting or supervisory powers over the trustees.

It would seem that the scope of this power to amend would be unlimited, except by the incorporation law, where the purposes for which the funds are presently held are not altered, and, furthermore, should include any reasonably necessary modification affecting present holdings, even of gifts said to be held in trust. Objections to the latter conclusions persist on the ground that the donor's intention is being perverted. However, in many instances, where donors have expressed a general charitable intent, and where performance on the original terms is either impractical or illegal, amendment may be merely an exercise of the power of cy pres. And even though the situation inviting change is not extreme enough to make possible a rationalization on cy pres principles, *it would seem that amendment, where reasonably necessary, should be allowed though contrary to terms of a gift that may have been fixed by a donor living in a different age.*" "The Charitable Corporation," 64 *Harv. L. Rev., supra,* at *pp.* 1178–1179. (Emphasis supplied)

Professor Scott has argued persuasively that such changes in the charter powers of charitable corporations should be deemed valid, where consented to by the corporation. Scott,

"Education and the Dead Hand," 34 *Harv. L. Rev.* 1 (1920). In that article he has summarized his views in the following words:

"What is the effect of consent by the corporation [to a change in its charter powers] expressed by vote of its board of trustees? On this question the Supreme Court of the United States has not passed. The state decisions are in conflict. Those decisions in which it is held that no change may be made even with the consent of the trustees, argue that to allow a change would be a breach of faith to the donors. And yet, as we have seen, it is agreed that the consent of the donors will not justify changes. Is it not a bit absurd to hold that the subsequent wishes of the donors are to be entirely disregarded and yet to contend that the expression of their wishes at the time they made their gifts are to be treated like the laws of the Medes and Persians? 'Under the guise of fulfilling a bequest,' said John Stuart Mill, 'this is making a dead man's intention for a single day a rule for subsequent centuries, when we know not whether he himself would have made it a rule even for the morrow * * *. No reasonable man, who gave his money, when living, for the benefit of the community, would have desired that his mode of benefiting the community should be adhered to when a better could be found.' It must not be overlooked that a too meticulous adherence to the words of the donor often means the defeat and not the accomplishment of his ultimate purpose. He intended to make his property useful to mankind. To render it useless is to defeat his intention."

In conclusion the author states,

"I would not contend that absolute power should be given to the trustees to divert charity funds to any charitable purpose they may select. Regularly they have the power and the duty of administering the property for the purposes for which it was given. Even where the purposes become impossible of accomplishment, they have no authority to proceed to apply the property to any other purposes. Such application may in that case be authorized by the courts, but may not be made by the trustees without such authorization. I would contend, however, that even if the precise purposes for which the property was given are not actually impossible of accomplishment, even if changes are not imperatively demanded, yet if the trustees consent to certain changes, and the court is of the opinion that such changes are not unreasonable in view of the general purposes of the donors and of the changes that time has brought to pass, in view, in short, of all the circumstances, the court should authorize such changes. I contend, in other words, that the consent of the trustees is a most important factor in determining what changes are justi-

fiable. The trustees are peculiarly fit to determine such questions. They hold and administer the property; they and they alone represent both the donors and the beneficiaries.

In the case of property held by a charitable corporation, the desired changes may require an amendment of the corporate charter. In that case I would contend that if the trustees consent to an act of the legislature authorizing such an amendment, the act should not be held unconstitutional if it is not so unreasonable as to subvert the general purposes for which the corporation was founded or for which its funds were given. The decision in the Dartmouth College case is not opposed to this view. Counsel for Dartmouth College admitted that the act of the legislature would have been valid if the trustees of the college had consented to it; the Supreme Court placed its decision on the ground of the lack of such consent. It is submitted that if the trustees had consented there would have been no impairment of the obligation of contracts, no arbitrary taking of property without due process of law or contrary to the law of the land, no exercise by the legislature of judicial power."

In *Trustees of Rutgers College in N. J.* v. *Richman,* 41 *N. J. Super.* 259 (*Ch. Div.* 1956), the court was called upon to determine whether a statute designed to afford Rutgers the opportunity to effect a substantial reorganization was a constitutionally valid enactment, and second, whether as fiduciaries, the trustees of the college were at liberty to exercise their choice in favor of this change. Justice (then Judge) Schettino decided both questions in the affirmative. In considering the nature of the college, he said,

"The first inquiry is directed to determining the nature of the 'charitable trust' held and administered by the Trustees of Rutgers College in New Jersey. It is created by charter and must pursue the charitable purposes outlined in its charter and amendments thereto. Because donations to such corporations are made in reliance upon the fulfillment of those charitable purposes, a charitable corporation partakes for most purposes of the nature of a trust."

Turning to the proposed changes the court observed,

"Although the amendments involved in the plan of reorganization concern themselves in the main with internal management, the nature of the amendments is such that they must be considered as fundamental and substantive. [citing cases]. The mere retention of control over the properties and assets by the Trustees as heretofore does

not make the transfer of management any the less substantive in nature.

We cannot dispose of the issue by an over-simplified conclusion that the modifications are inconsequential or do not substantially affect the underlying trust and charter."

In fact, the changes were basic in that, among other things, they transferred the general supervision and conduct of the University to an entirely different board, quite differently constituted than the then existing board of trustees.

Coming finally to the issue which concerns us here, Justice Schettino said,

"The amendments must be analyzed to determine whether they constitute a substantial departure from the purposes of the charity and its charter. The proofs before the court through the exhibits and affidavits fully demonstrate that the reorganization plan is a fair and reasonable step in the development of the functions and purposes of the University. Present and future demands for expansion and financial aid, plus the past role of the University in its relations with the State, reveal that the contemplated step is a most reasonable advance in the successful development of the institution."

I would apply this reasoning to the case before us. The management of the hospital, for reasons that seem adequate, has determined that it would be in its best interests to move. Its certificate of incorporation, as amended, authorizes such action. Finally, assuming as I have done, that location within the municipal limits of the city was a definite part of the original scheme, yet I cannot believe that this proposal will, in Justice Schettino's language, "constitute a substantial departure from the purposes of the charter." Were it proposed that the hospital facilities be moved to a location a considerable distance from the hospital's present site, we would be faced with a different question, for there the community to be benefited would have changed. Here the proposal does not remove the facilities from the community which it has long served, nor can it be said that the residents and citizens of Paterson will not have, for the most part at least, as reasonably easy access to the hospital as heretofore. The hos-

pital is not a political instrumentality. It is not an adjunct of city government nor is it in any way, in its function as a hospital, subject to municipal control. If the very basic changes in the organization of Rutgers were found acceptable, surely the relatively modest proposal we are considering must be deemed unobjectionable.

Plaintiffs further urge that all of the terms of the charter of 1871 are protected by the contract clause of the Federal Constitution, *Article* 1, *section* 10, citing *Trustees of Dartmouth College v. Woodward,* 4 *Wheat.* 518, 4 *L. Ed.* 629 (1819), and that there exists no power in our Legislature to authorize change, either by special or general law. The short answer to this argument, as appears above, is that any such change can only be successfully attacked on this ground if there is a lack of assent on the part of the trustees of the charity. Here the trustees are the proponents of the change.

An interesting case on its facts is *Bryan v. Board of Education,* 151 *U. S.* 639, 14 *S. Ct.* 465, 38 *L. Ed.* 297 (1894). The Kentucky legislature in 1858 granted a charter to Kentucky Wesleyan College to form a college in Millersburg, Kentucky. It seems clear from Justice Harlan's opinion that the citizens of Millersburg were largely instrumental in securing the charter and contributed substantially to the fund needed to build the college; it is also clear that it was the general expectation that the establishment would always be located in Millersburg. About the time the buildings were completed the legislature amended the charter authorizing the removal of the college to another location at a considerable distance but within the State of Kentucky. The only issue before the Supreme Court was whether the legislation permitting the move violated the contract clause of the Federal Constitution. It was held that it did not. The court said,

"The argument in support of the existence of the alleged contract rests upon the words of various documents showing that the original purpose of those who were instrumental in establishing this institute was to have it located at Millersburg. Undoubtedly, those persons were moved to act, in some degree, by the belief that the seat of the

> proposed college would be at Millersburg. That belief is disclosed in the resolutions adopted by the citizens of Millersburg at the meeting of January 4, 1858. It is also expressed in the charter of the institute granted in the same year, reciting that money had been subscribed for the purpose of erecting in or near said town a seminary of learning. It is again expressed in the certificates of perpetual scholarships issued under the authority of the conference. It is further expressed in the charter of the Board of Education of 1860, referring to the college as having been 'located' at Millersburg, with buildings then ready for occupancy."

The similarity in factual background between that case and the one before us is apparent. See also *Pennsylvania College Cases*, 13 *Wall.* 190, 20 *L. Ed.* 550 (1872).

It may be suggested that the precedents discussed above involve mainly educational institutions and that we are here considering a hospital. The distinction is without significance. Both are eleemosynary organizations. The rule permitting needed change within the ambit of original general purpose is as applicable to one as to the other. Both fall easily within the classical definition of charities as set forth in the preamble to the Statute of Charitable Uses, 43 *Eliz I, c.* 4 (1601). See 4 *Scott on Trusts* (2d ed.), 2630–2631.

It is time to consider the reasons that provoked this action on the part of the trustees and to determine their validity as a basis for the action taken. It was brought out by the evidence that as long ago as 1956 the management of the hospital came to realize that the physical plant was outmoded and that it would be necessary either substantially to remodel the present facilities or build anew elsewhere. Many of the present hospital units are very old and the cost of maintenance is high. It was suggested that even if the present facilities were remodeled the result would not be a modern hospital. In the meantime the hospital was having difficulty attracting interns and nurses. Of course, the court is aware that this difficulty has been shared by hospitals throughout the country. In 1964 professional consultants were employed to advise the trustees. After making an extensive study of the problem it was recommended that the hospital move, the

present site of about six acres being deemed entirely inadequate. To create a modern hospital at the present location would appear to require the replacement of almost all of the buildings, and even then facilities for off-street parking would be drastically inadequate. Other objections were noted. It was further determined by the consultants, acting in conjunction with the hospital's management, that no other adequate site existed within the City of Paterson. The feasibility of rebuilding on the present site was, however, further studied and a plan looking to this end prepared. It was determined that to modernize and rebuild, having in mind a 300-bed hospital, would cost about $12,000,000 and that after this had once been done it would thereafter be very difficult or impossible to expand further. Nor would the resulting functional relationship of the various buildings be ideal. It was also pointed out that substantial federal funds are available for modern hospital construction but that grants of such nature are much less readily available with respect to a completely urban facility than with respect to a facility regional in nature. It was recommended that if possible a site in Wayne Township be found, as for various reasons this was felt to be the best location in the area.

Dr. Eugene D. Rosenfeld, a representative of the consulting agency, testified at the trial. He stated that in his opinion the removal of the hospital from its present location to the proposed site in Wayne Township would in no way diminish the opportunity for hospital services now available to residents of Paterson. He further stated that all of the hospital's services could be performed better from this new location than they are now being performed. He pointed out that in actuality some of the poorer sections of Paterson were nearer to the proposed site than to the present hospital, or were at least as close. New facilities at the location proposed would vastly improve the possibility for the continuing recruitment of professional and medical staff. A study for the period December 1966 through April 1967, substantially confirming earlier studies, showed that only 2% to 4% of the patients

reached the hospital on foot. All others arrived by motor car. It was admitted that in an emergency the travel time from the present site to the proposed new site would be only six or seven minutes.

It is my conclusion, and I find, that the evidence before the trustees was such as to justify their decision that the existing hospital facilities are outmoded and inadequate; that for the continued successful life of the hospital they must be replaced or renewed, and that as a matter of sound judgment a new site, such as that acquired in Wayne Township, offers vastly greater opportunities than would be afforded by a continued use of the present property. Hence, I find that under all of the circumstances the trustees' decision was entirely reasonable.

A subsidiary point of some importance should be noticed. Defendant has persistently contended throughout this case that the plaintiffs City of Paterson and two individual residents and taxpayers of the municipality have no status to initiate and prosecute these proceedings. The court does not agree. While my opinion upon the principal point involved in this case is contrary to the contentions and views urged by plaintiffs, I think they had every right to bring this suit. "A person who has a special interest in the performance of a charitable trust can maintain a suit for its enforcement." 4 *Scott, op cit.*, 2758. Although the court has disagreed with plaintiffs that a charitable trust is involved, all parties and the court agree that defendant is a charitable corporation charged with the performance of certain duties in the public interest. The rule that parties especially interested may sue to compel performance is as applicable to the law of charitable corporations as to the law of charitable trusts.

An important policy argument in support of this position should not be overlooked. It must be conceded that in this State, and throughout the country as a whole, supervision of the administration of charities has been neglected. Charities in this State, whether or not incorporated, are, in general, only subject to the supervision of the Attorney General.

The manifold duties of this office make readily understandable the fact that such supervision is necessarily sporadic. In England the Board of Charity Commissioners, created pursuant to the Charitable Trusts Act of 1853, 16 and 17 *Vict., c.* 137, has exercised some semblance of control over such organizations, but even this method of supervision has proven inadequate. See *Keeton, The Modern Law of Charities,* 175–195 (1962). The Charities Act of 1960, 8 and 9 *Eliz* II, *c.* 58, has sought to remedy these inadequacies. The whole problem of the limited extent of supervision of charities throughout the United States, with recommendations for improvement, is carefully considered in Karst, "The Efficiency of the Charitable Dollar: An Unfulfilled State Responsibility," 73 *Harv. L. Rev.* 433 (1960). While public supervision of the administration of charities remains inadequate, a liberal rule as to the standing of a plaintiff to complain about the administration of a charitable trust or charitable corporation seems decidedly in the public interest.

There will be judgment for defendants in accordance with the views expressed above.