GORDON *v.* MAYOR AND CITY COUNCIL
OF BALTIMORE, ET AL.

[No. 37 (Adv.), September Term, 1970.]

*Decided July 9, 1970.*

The cause was argued before HAMMOND, C. J., and MC-
WILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Robert J. Thieblot* and *John D. Alexander, Jr.,* with whom were *Allen, Thieblot & Alexander* on the brief, for appellant.

*Howard E. Wallin, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for appellees Mayor and City Council of Baltimore and Enoch Pratt Free Library of Baltimore City.

*Ambler H. Moss,* with whom was *William A. Fisher, Jr.,* on the brief, for appellee The Peabody Institute of the City of Baltimore.

SINGLEY, J., delivered the opinion of the Court.

George Peabody, one of the greatest of the nineteenth century philanthropists, cast his gift to the people of Baltimore in a form typical of his time.[1] He determined to

---

1. George Peabody was born in 1795 in South Danvers (now Peabody), Massachusetts. At age 11, after four years of schooling, he was apprenticed to a local grocer. Later he worked for a year for his brother in Newburyport and in 1812 moved to Georgetown, District of Columbia, where he was employed by an uncle. In 1814, with capital supplied by Elisha Riggs, with whom Peabody had served in the War of 1812, the firm of Riggs & Peabody entered the dry goods business in Georgetown, and in 1815 the business was moved to Baltimore. By 1829, Riggs had retired and Peabody became the senior partner in the firm. In 1837 he moved to London, where he formed the banking house of George Peabody & Co., of which Junius S. Morgan became a partner in 1854. On Mr. Peabody's retirement in 1867 the firm became J. S. Morgan & Co., and was the predecessor to Morgan, Grenfell & Co.

In about 10 years, commencing in 1857, Peabody gave away three-fourths of a fortune estimated at about $12,000,000: $1,400,000 to form the Peabody Institute in Baltimore; $250,000 to found the Peabody Institute at Peabody; $150,000 to Yale University; $150,000 to Harvard; $140,000 to establish the Peabody Academy of Science at Salem; $3,500,000 to constitute the Peabody Education Fund, which was designed to foster education in the South after the Civil War, and is now the George Peabody College for Teachers at Nashville, Tennessee, and $2,500,000 to the City of London for the construction of houses for working men.

Peabody died in London in 1869 and was buried in Westminster Abbey. In accordance with his wishes, his body was brought to the United States for burial in Massachusetts—but by a British warship provided as a mark of esteem by Queen Victoria. See 14 *Dictionary of American Biography* (1934) at 336; Wilson, *George Peabody, Esq.* (1926).

establish an "institute" which would have as its purpose "the improvement of the moral and intellectual culture of the inhabitants of Baltimore, and collaterally to those of the State; and, also, towards the enlargement and diffusion of a taste for the Fine Arts." [2]

As we shall see, nine years passed before The Peabody Institute of the City of Baltimore (the Peabody or the Institute) opened its doors on 25 October 1866, but when it did, it endeavored to adhere faithfully to the founder's desires.[3] A library had begun to be assembled in 1861; the first orchestra concert was given in 1866; public lectures were begun soon after the opening; a conservatory of music was established in 1868, and an art gallery was opened in 1881.

By the turn of the century, the public lectures had been abandoned, largely as a consequence of the founding of The Johns Hopkins University (Johns Hopkins) in 1876 and of Goucher College in 1885; in the 1960's the art collection was dispersed by sales and loans to other institutions; and by 1962 the Peabody trustees had definitely determined to dispose of the Institute's library of nearly 300,000 volumes. When the negotiations undertaken with Johns Hopkins in that year proved fruitless, the Peabody's president approached the trustees of The Enoch Pratt Free Library (the Pratt) in Baltimore.[4] These negotiations led to the execution of a "memorandum of understanding" between Peabody and the Pratt on 14 February 1966 and to the execution of an instrument assigning and transferring the books in July of that year.

In September, Douglas H. Gordon, a member of the Baltimore bar and former member of the Peabody's board

2. Letter, Peabody to his trustees, 12 February 1857.
3. The building had been completed in 1861, but the dedication was delayed by the Civil War.
4. The Pratt was founded in 1882 by Enoch Pratt, one of the Peabody trustees and the first treasurer of the Institute. Like Mr. Peabody, Pratt was a native of Massachusetts who had come to Baltimore where he entered the iron business. He agreed to build a building to cost about $250,000 and to transfer the sum of $833,333 to the City of Baltimore on the condition that the City pay an annuity of $50,000 to the Library in perpetuity. The Library opened in 1886.

of trustees, filed a bill of complaint in the Circuit Court of Baltimore City against the Peabody, the Pratt and the Mayor and City Council of Baltimore (the City).[5] Mr. Gordon's bill sought to enjoin the Peabody from transferring books to the Pratt; to enjoin the Pratt from receiving books from the Peabody and from making any expenditures in connection with the transfer; to enjoin the City from participating in the transfer and from contributing to the cost of the transfer; and finally, prayed that an order be passed that any Peabody books transferred to the Pratt be returned and that the instrument of assignment and transfer be cancelled. The Peabody, the Pratt and the City demurred and answered. The demurrers, which challenged Mr. Gordon's standing to sue, were overruled, and the case went to trial on the merits. From a decree dismissing the bill of complaint, Mr. Gordon has appealed.

Since at the trial below, the appellant conceded that the Peabody trustees had the power to transfer custody of the library to Pratt, there are really only two issues presented by this appeal: (i) Did Mr. Gordon have standing to sue; and, (ii) Did the terms of Mr. Peabody's gift prevent a transfer to the Pratt of title to, supervisory control over, and responsibility for, the books which comprised the Peabody Library?

### (i) *Did Mr. Gordon Have Standing to Sue?*

Mr. Gordon advances an alternative argument in support of his standing. First, he says that he is a resident of the City and a taxpayer. His alternative proposition is that either as a former trustee of the Peabody, as a contributor to the Peabody, or as a beneficiary of George Peabody's trust, he has standing to enforce the trust.

In the hearing on demurrer below, Judge Cardin found that Mr. Gordon had standing as a taxpayer. Because we regard this conclusion as correct, it is unnecessary for

---

5. The Honorable Thomas B. Finan, then Attorney General of Maryland, was joined as a defendant. His demurrer to the bill was sustained.

us to reach the alternative proposition. See, however, *Carter v. Mayor & C.C. of Baltimore,* 197 Md. 70, 83, 78 A. 2d 212 (1951) and 4 Scott, *The Law of Trusts* § 391 (3d Ed. 1967) at 3002, ff.

The case of *Mayor & C.C. of Baltimore v. Gill,* 31 Md. 375 (1869) first identified the elements which will support the bringing of a taxpayer's suit. In that case the City wished to raise money to assist the Western Maryland Railroad in the completion of its Williamsport line. The City proposed to do this by borrowing $1,000,000 and pledging as security certain Baltimore and Ohio Railroad Company stock which it owned. This Court held this to be in violation of Art. XI, § 7 of the Maryland Constitution, which prohibits the creation of debt by the City without the authorization of the General Assembly and approval by the voters. The complainants, who were taxpayers, had sought to enjoin the borrowing. In discussing their standing this Court said:

> "* * * [T]hese complainants, as taxpayers of the city, and others similarly situated, in whose behalf as well as their own the bill is filed, constitute a class specially damaged by the alleged unlawful act of the corporation, in the alleged increase of the burden of taxation upon their property situated within the city."
>
> * * *
>
> "In this State the courts have always maintained with jealous vigilance the restraints and limitations imposed by law upon the exercise of power by municipal and other corporations; and have not hesitated to exercise their rightful jurisdiction for the purpose of restraining them within the limits of their lawful authority, and of protecting the citizen from the consequence of their unauthorized or illegal acts." 31 Md. 394, 395.

Other cases where taxpayers were recognized to have standing because of a clear showing of potential pecuni-

ary damage are *Masson v. Reindollar*, 193 Md. 683, 69 A. 2d 482 (1949), where the plaintiffs sued to enjoin the State Roads Commission from awarding contracts for the building of the Chesapeake Bay Bridge until it had sought bids to determine the cost of a tunnel as an alternative, and *Pressman v. Barnes*, 209 Md. 544, 121 A. 2d 816 (1956), where the plaintiff attacked an ordinance creating the position of Baltimore's Director of Traffic and authorizing him to promulgate traffic regulations.

Perhaps the most liberal application of the test may be found in *Castle Farms Dairy Stores, Inc. v. Lexington Market Authority*, 193 Md. 472, 67 A. 2d 490 (1949). There, the plaintiffs were taxpayers and stall owners who unsuccessfully sought to have the Act establishing the Lexington Market Authority declared unconstitutional. The Court held that they had standing as taxpayers:

> "If the Act is unconstitutional, the project is unlawful, and even though the City would not be obligated for the project, it presumably would incur some expense or loss in extricating itself and its property. As taxpayers, therefore, plaintiffs, are entitled to sue to enjoin such an unlawful project." 193 Md. at 482.

A contrary result was reached in *Ruark v. International Union of Operating Engineers*, 157 Md. 576, 146 A. 797 (1929). There, the plaintiffs sued to enjoin the City from permitting certain contractors on City jobs to violate the maximum hours and minimum wage laws. Their standing, if any, was as taxpayers, but the Court held that since no pecuniary loss to the taxpayers of the City was alleged or proved, the standing must be denied and any redress against the violators would have to be obtained through criminal prosecutions.

> "The special damage which the taxpayer of the political division sustains in a public wrong is the prospective pecuniary loss incident to the increase in the amount of taxes he will be con-

strained to pay by reason of the illegal or *ultra vires* act of the municipality or other political unit. Hence, the taxpayer's interest in the subject matter is not general, but special only, because of the future individual monetary burden cast upon him or his property." 157 Md. at 589.

A similar result was reached in *Citizens' Comm. v. County Comm'rs,* 233 Md. 398, 197 A. 2d 108 (1964) where no monetary damage was shown.

The appellees make much of the fact that the Pratt, like the Peabody, is a private institution and that the City's obligation toward the support of its operation is limited by contract to an annual appropriation of $100,-000.[6] We find this argument both unrealistic and unpersuasive. The simple facts are that except for the Peabody, the Pratt is Baltimore's only public library, which was found to be a "public or municipal purpose," in *Johnson v. Mayor & C.C. of Baltimore,* 158 Md. 93, 148 A. 209, 66 A.L.R. 1488 (1930), where a similar point was made. Its buildings are owned by the City, as are the books in its collection, other than those purchased from the Pratt's limited endowment; and finally, and most significantly, the City's annual appropriation in support of the Pratt is in the area of $6,000,000, and there is no suggestion that this pattern is likely to change. There is testimony in the record before us that by accepting the Peabody collection, the Pratt has assumed an annual obligation of some $100,000 for salaries alone. For reasons to be developed later, the cost of preserving the collection itself may exceed $1,000,000. That these expenses are and will be borne by the City's taxpayers, including Mr. Gordon, is beyond question. In fact, the memorandum of understanding provides in part that "Pratt will seek to have [certain operating] expenses included in its annual ap-

---

6. This is the $50,000 annuity exacted by Mr. Pratt and an additional annual payment of $50,000 which was a condition of a $500,000 gift to the City by Andrew Carnegie in 1907. An interesting account of the history of the Pratt may be found in *Kerr v. Enoch Pratt Free Library of Baltimore City,* 54 F. Supp. 514 (D. Md. 1944), *rev'd* 149 F. 2d 212 (4th Cir. 1945).

propriations from the City of Baltimore." We are of the opinion that Mr. Gordon has standing to question the acceptance of the books by the Pratt because of the responsibility which the City will assume, and this challenge necessarily calls for a consideration of the question whether the terms of Mr. Peabody's gift prevent the transfer.

(ii) *Did the Terms of Mr. Peabody's Gift Prevent a Transfer to the Pratt of Title to, Supervisory Control Over, and Responsibility for the Books which Comprised the Peabody Library?*

On 12 February 1857, Mr. Peabody wrote to 25 of his friends in Baltimore, inviting them to serve as the trustees of the institute he proposed to establish.

The paragraphs relevant to the issue before us are quoted:

"In presenting to you the object I propose, I wish you to understand that the details proper to its organization and government and its future control and conduct, I submit entirely to your judgment and discretion; and the perpetuity of that control I confide to you and your successors, to be appointed in the manner prescribed in this letter."

\* \* \*

"You and your successors will constitute forever a Board of Trustees, twenty-five in number, to be maintained in perpetual succession, for the accomplishment, preservation and supervision of the purposes for which the Institute is to be established. To you and your successors, therefore, I hereby give full and exclusive power to do whatsoever you may deem most advisable, for the foundation, organization and management of the proposed Institute: and to that end I give to you, and will place at your disposal, to be paid to you as you may require, for the

present, three hundred thousand dollars, to be expended by you in such manner as you may determine to be most conducive to the effective and early establishment and future maintenance and support of such an Institute as you may deem best adapted to fulfil my intentions as expressed in this letter.

"In the general scheme and organization of the Institute, I wish it to provide —

"*First.*—For an extensive Library, to be well furnished in every department of knowledge, and of the most approved literature; which is to be maintained for the free use of all persons who may desire to consult it, and be supplied with every proper convenience for daily reference and study, within appointed hours of the week days of every year. It should consist of the best works on every subject embraced within the scope of its plan, and as completely adapted, as the means at your command may allow, to satisfy the researches of students who may be engaged in the pursuit of knowledge not ordinarily attainable in the private libraries of the country. It should be guarded and preserved from abuse, and rendered efficient for the purposes I contemplate in its establishment, by such regulations as the judgment and experience of the Trustees may adopt or approve. I recommend, in reference to such regulations, that it shall not be constructed upon the plan of a circulating library; and that the books shall not be allowed to be taken out of the building, except in very special cases, and in accordance with rules adapted to them as exceptional privileges."

Succeeding paragraphs called for "lectures by the most capable and accomplished scholars and men of science, within the powers of the Trustees to procure" on subjects in "science, art and literature"; for the establishment of

"an Academy of Music * * * By providing a capacious and suitably furnished salon, the facilities necessary to the best exhibitions of the art, the means of studying its principles and practicing its compositions, and periodical concerts * * *"; and for the "establishment of a Gallery of Art in the department of Painting and Statuary."

Two days later, Mr. Peabody sent the trustees a list of 200 names, from which future trustees could be chosen. Five days later the trustees, save one, accepted the appointment. Peabody funded the trust with an initial contribution of $300,000 and formalized the arrangement by deed of trust dated 4 March 1857. An interesting sidelight is found in the fact that Mr. Peabody originally contemplated that the Maryland Historical Society would, according to his letter, become "the guardian and protector of the property of the Institute" and would assume "management and administration of [its] operations," with the Institute's trustees retaining "visitorial" powers. That Peabody may have had some doubts about this can be gleaned from the deed of trust which authorized the trustees "to select some other agency, competent in their judgment to carry out [his] wishes in the premises," should the Historical Society fail to act. In fact, the Society withdrew, by formal action taken at Mr. Peabody's request, five months before the Institute opened.

By Chapter 209 of the Laws of 1858, the General Assembly of Maryland granted a charter to the Peabody. The bill incorporated the Peabody letters of 12 and 14 February 1857, the trustees' acceptance, referred to the deed of trust and granted to the trustees "all the powers of a body corporate, necessary or proper, to accomplish and carry out the purposes for which said Institute is designed, as declared and set forth in said letter [of 12 February 1857]" and in the deed of trust. On 18 October 1858, Peabody promised to contribute $25,000 annually for six years and on 19 October 1866, added $500,000 to the endowment. In 1869 he made a final gift of bonds in an aggregate principal amount of $400,000.

Mr. Gordon argues that the library was intended by

Mr. Peabody to be a first charge on the resources he provided. For a half century, this was the case. The purchase of books commenced in 1861, five years before the Institute opened, and was pursued assiduously for half a century. After ten years the collection consisted of 44,000 volumes; by 1878, a wing had been added to house the library, which had then grown to about 67,000 volumes. By 1913, there were 200,000 books in the Peabody Library which was a widely known research and reference collection, particularly strong in the classics, in history and in nineteenth century literature and scientific works. From the founding of Johns Hopkins in 1876 and until 1886, when the Pratt opened, the Peabody was not only the library of the University, but Baltimore's only public library, as well. In about 1913, Johns Hopkins moved to Homewood and began to expand its own library, but considerable reliance continued to be placed on the Peabody which had the earlier issues of scientific and scholarly journals, which the University continued.

What happened next is the all too familiar story: the Peabody's income simply failed to keep pace with rising costs. The "Academy of Music" envisioned by Mr. Peabody had become the Peabody Conservatory, described in testimony as one of a half dozen places in the United States where a student may pursue the study of music on a professional level. The Peabody trustees maintained separate operating accounts for the Library and the Conservatory. In the last three full fiscal years of operation, the Library's income ranged between $3,000 to $9,000 and expenses (principally salaries) were in the $70,000 to $90,000 range, with the result that deficits for the years 1964, 1965 and 1966 were, respectively, $81,079; $68,117; and $65,645. The trustees had other unallocated income, but the whole of this, after deducting unallocated expenses, was not sufficient to meet the Library's deficit. Strapped by a shortage of funds, the Peabody trustees began in about 1910 to allocate virtually no funds for the purchase of books, and could provide only inadequate support for the maintenance of the existing collection, so

that in the 50 years from 1913 to 1963, the Library increased from the 200,000 volumes accumulated in its first half century to about 270,000 volumes, largely as a result of gifts and bequests. At the same time, the condition of the books was rapidly deteriorating. Even in its present state, there is no doubt that the collection is a valuable one. In 1942, the Peabody's librarian estimated replacement cost at $10,000,000. There was testimony that the University of Hawaii had offered $2,500,000 for the collection, and might have paid more.

On 14 February 1966, the Peabody and the Pratt entered into the memorandum of understanding with the approval of their respective boards. Its significant provisions follow:

"The Trustees of the Enoch Pratt Free Library (Pratt) and the Trustees of the Peabody Institute (Peabody) agree as follows:

"1. The Peabody Library collection other than the music collection will be transferred to Pratt to become a part of the Pratt collection. As a condition of the transfer, Pratt agrees that the materials from the Peabody Library collection shall be used in accordance with Mr. Peabody's letter of February 12, 1857. Pratt agrees to identify in its catalogue all materials received from Peabody so long as practicable. If at any time Pratt shall determine that such identification is no longer practicable, it will so notify Peabody. The music collection will be retained by Peabody and be administered by it in separate quarters as a part of the Peabody Conservatory of Music.

"2. Pratt will undertake to continue use of the present Peabody Library building for library purposes as a branch or facility of Pratt. It is hoped that initially, this service will include the following:

(a) books and periodicals chiefly used for genealogical research;

(b) maps, charts, and atlases other than those required for general reference and current information service;

(c) selected material for a medieval studies center;

(d) picture collection;

(e) supplementary educational center for student use.

"It is the present joint intention of Pratt and Peabody to continue use of the Peabody building for library purposes indefinitely into the future and Pratt will use the Peabody building for library purposes at least through the fiscal year ending June 30, 1986. It is agreed, however, that all questions of character of use and continuance or discontinuance of any particular service shall be determined by Pratt. The library building shall be known as the George Peabody Branch of the Enoch Pratt Free Library.

"3. The Peabody Library building, including heat, light and other utilities, will be made available to Pratt without expense to Pratt. Peabody shall have the right, however, at any time after June 30, 1986, to terminate this obligation and may require that Pratt either vacate the building or, if it continues to occupy the building, do so on a basis other than the terms provided in this paragraph 3. At the request of Pratt, Peabody will make renovations and improvements in the library building in accordance with plans and specifications approved by the two institutions, and Peabody shall be repaid the cost of such work on terms mutually agreed upon by the two institutions.

"4. It is understood that shortly after transfer of the collection to Pratt, Pratt may decide to dispose of some items, which based on an analysis by the Directors and appropriate staff members of the two institutions, are now consid-

ered to be items either duplicating materials already in the Pratt collection or serving no useful purpose in the combined collection. The proceeds realized from the disposition of such items shall be set aside in a special fund which shall become a part of the Pratt endowment and shall be used in the discretion of the Trustees of the Pratt for purposes consistent with Mr. Peabody's letter mentioned above.

"5. Pratt will make an annual report to the Peabody of the use made of the materials in the Peabody collection and of the proceeds of any disposition thereof."

On 3 March 1966 there was a joint press release, which outlined the arrangement, and contained the first intimation of what was to come:

"Duplicate and surplus materials would be disposed of by mutual consent of the two institutions."

As of 1 July, the understanding was implemented by the execution and delivery of an "instrument of assignment and transfer" and a lease under which the Pratt could occupy the Peabody Library for 20 years, without the payment of rent, on the condition that the Pratt maintain a branch library on the premises and shoulder the operating expense.

The more important of the two documents, the instrument of assignment, by which title to the Peabody collection was transferred to Pratt, recited only that an understanding had been reached, without describing it, and continued:

"*Now, Therefore,* Peabody does hereby by these presents, give, grant, assign and transfer unto Pratt all its right, title and interest in the collection of library books, materials and records, heretofore known as the Peabody Library,

as reflected in the shelf list of said library as of July 1, 1966.

"Pratt agrees to use in accordance with the library purposes set forth in the letter of February 12, 1857 from George Peabody to the Trustees of the Peabody Institute, the books and materials hereby transferred, or such part thereof retained by Pratt from time to time.

"Pratt further agrees that all proceeds received from time to time from the disposition of any of said books and materials, and all income from the investment of such proceeds, shall be held by Pratt as a part of its endowment funds and used, in the discretion of the Trustees of Pratt, for purposes consistent with the library purposes expressed in the said letter of Mr. Peabody.

"Pratt further agrees that, so long as it deems practical, it will identify in its catalogue all books and materials hereby transferred and retained by it and if at any time Pratt shall determine that such identification is no longer practical it will so notify Peabody.

"Pratt will make an annual report to Peabody of the use made of the books and materials hereby transferred and the proceeds of any disposition thereof."

Meanwhile, representatives of the Pratt had been examining the Peabody collection, and by early June of 1966 had determined that about 78,000 volumes, or about 38% of the collection could be disposed of. At the instance of the Pratt, Mr. Robert Metzdorf, a qualified appraiser, came to Baltimore and spent 58 days examining the collection. He reached the conclusion that some 115,000 volumes which Pratt did not plan to incorporate in its collection or leave at the Peabody branch had a value of $777,000 after taking a discount of 20% on the assumption that they would be transferred to another institution.

In the early fall of 1966, word of this had become public knowledge, leading first to the filing of Mr. Gordon's complaint in September and in October to the adoption of a resolution by the General Assembly of the Homewood faculties of Johns Hopkins:

"The General Assembly of The Johns Hopkins University, representing the faculties of this institution, views with deep apprehension present developments in connection with the merger of the Peabody Library with the Pratt Library and the possible loss to this city of one of its richest scholarly and cultural resources.

"Particularly alarming is the prospect that 100,000 or more volumes of the Peabody collection are to be sold. Among those volumes are some of the most valuable and irreplaceable books in the collection. The loss to this city, and in particular to the scholarly-minded citizens of the community, would be enormous.

"Especially distressing is the fact that apparently The Johns Hopkins University is on the verge of being forced to seek funds in excess of $1,000,000 to preserve this collection not only for the use of its own faculty and students but for the general use of citizens of Baltimore as well.

"THEREFORE, BE IT RESOLVED that the General Assembly find appropriate ways to express its concern about this matter to such bodies and individuals as the Board of Trustees of the Peabody and Pratt Libraries and the Mayor and the President of the City Council through the appointment by the President of five members of this body who shall be empowered to speak publicly for the Assembly on this subject and to keep themselves fully informed of all future developments concerning these institutions."

In a letter transmitting the resolution to the Pratt, the faculty committee remarked:

"We find it discouraging that a private, non-profit university should have to purchase these books from a public library in order to preserve for the public a famous collection donated to the public by one of the city's leading philanthropists. If Johns Hopkins should find it impossible to raise the necessary funds to purchase the collection, the books might well be lost to Baltimore and scattered throughout the world, and Mr. Peabody's purpose would be violated."

A week later, Mr. William L. Marbury, then Chairman of the Peabody trustees, wrote to Mr. Charles S. Garland, then Chairman of the Hopkins trustees. After recalling the abortive negotiations with Hopkins, and the arrangement entered into with the Pratt, Mr. Marbury said:

"The Pratt trustees then offered to take over the bulk of the collections and to maintain a useful library facility on Mt. Vernon Place. They further agreed that the collections would be maintained in accordance with the terms of Mr. Peabody's gift. They reserved the right, however, to dispose of books which were duplicates or which were otherwise surplus to Pratt operations.

"The Peabody trustees accepted the Pratt's offer because they could not see a better solution. They recognized that a good deal would depend on the Pratt's definition of the proper scope of its activities and that a substantial number of books might not be included within that scope. From conversations which I have had with Ed Castagna [the director of the Pratt], I find that it is not yet possible to state just what Peabody books the Pratt does not want to take over. I gather, however, that there are roughly

58,500 separate titles which have been tentatively listed in this category.[7] Of those, approximately 47,500 have been appraised at a value of approximately $558,000. The remaining 11,000 have not yet been appraised and include a number of 'large size' books, the value of which may be larger per title than those which have been appraised. Included in these books are many titles which are duplicated in the collections of the Pratt or of other institutions in this community, but the exact number of these can be determined only after a careful analysis, which has not been made.

"It seems to me that the first thing is to reach a final determination of the titles which the Pratt does not want to take over. The second thing is to determine how many of these titles are duplicated in the collections of other institutions in this community. Then, and only then, will we know the proportions of the problem with which we have to deal."

On 23 December 1966, Mr. Marbury wrote to Mr. C. Keating Bowie, Chairman of the Pratt trustees:

"Sometime ago Chuck Garland spoke to me about the Library and asked whether there was anything that he should be doing. I told him that I understood that the Pratt was doing the following:

"1. Making a final determination of the books which were to be retained at Mt. Vernon Place and the books which were to be moved to the main library.

"2. Making up a list of the books which Pratt did not wish to keep, together with their appraised value.

"3. Determining how many of the books

---

[7]. Because a "title" may comprise more than one volume, the number of titles may be smaller than the number of volumes.

listed under paragraph 2 were duplicated elsewhere in Baltimore. (I indicated to him that this might present some practical difficulties but that it was my understanding that the Pratt was prepared to go as far as reasonably possible along this line.)

"I told him that when these things had been done, it was my understanding that you would get in touch with me and with him and that we would set up a meeting to discuss the disposition of the books which fall into Class 3. In this connection I said that I was confident that the Pratt trustees wanted to see the books which. have formed a part of the Peabody collection remain in Baltimore. I was further confident that the Pratt trustees would cooperate with the Peabody trustees and with the Hopkins trustees in seeking to raise whatever funds might be necessary to accomplish this result.

"The recent report in the *Sun* of statements made by Ed Castagna has caused some uneasiness, since there is apparently a definite impression abroad that the Pratt intends to sell 75,000 to 100,000 volumes to the highest bidder. Every time I hear this rumor I deny it, and I shall certainly continue to do so, since such an action in my opinion would hardly be consistent with the undertaking of the Pratt trustees to administer the Peabody collection in accordance with the terms of Mr. Peabody's letter."

The appellant says that there was no reply to this letter, and points out that Mr. Bowie was not called as a witness for the defendants. Mr. Marbury, however, testified that there had been subsequent meetings and this must have been the case in connection with the preparation of an appeal made to the Ford Foundation.

The record discloses no solid ground on which a scheme of disposition will be grounded. The defendants did offer

in evidence a submission made in mid-1967 by the Pratt to the Ford Foundation, seeking funds of some $1,850,000 in support of the merger, endorsed by Johns Hopkins, Goucher College, the Peabody and the Walters Art Gallery. This scheme contemplated the sale of some 32,000 volumes which are duplicates of those already in the Pratt's collection, at a price of $192,000. This would seem to be in line with a recommendation made by Emerson Greenaway, director of the Free Library of Philadelphia and Frederick Arnold, of the Princeton University Library, who had been consulted by the Pratt.

Perhaps an analysis of the legal principles here involved can be more readily achieved by emphasizing what this case is not. It cannot be viewed as an action for the enforcement of a charitable trust under 43 Eliz. I Ch. 4, because the Statute of Charitable Uses was never in force in Maryland, *Book Depository v. Trustees,* 117 Md. 86, 91, 83 A. 50 (1912) ; *Halsey v. Convention of the Protestant Episcopal Church,* 75 Md. 275, 23 A. 781 (1892) ; *Dashiell v. Attorney General,* 5 H & J 392, 403 (1822), 6 H & J 1 (1823), until it was legislatively adopted in principle by Chapter 453 of the Laws of 1931, now Maryland Code (1957, 1966 Repl. Vol., 1969 Cum. Supp.) Art. 16, § 195, which has been held to be not retroactive. *Loats Female Orphan Asylum v. Essom,* 220 Md. 11, 150 A. 2d 742 (1959) ; *Fletcher v. Safe Deposit & Trust Co.,* 193 Md. 400, 67 A. 2d 386 (1949).

Nor may it be regarded as a case where the doctrine of *cy pres* could be invoked under Code, Art. 16, § 196, since the prerogative power of *cy pres* never existed in Maryland, and judicial power was first sanctioned by Chapter 291 of the Laws of 1931, *Miller v. Mercantile-Safe Deposit & Trust Co.,* 224 Md. 380, 168 A. 2d 184 (1961) ; Note, 22 Md.L.Rev. 340 (1962), which we have held not to operate retroactively, *Loats Female Orphan Asylum v. Essom, supra; Fletcher v. Safe Deposit & Trust Co., supra; Gray v. Harriet Lane Home,* 192 Md. 251, 64 A. 2d 102 (1949).

Nor does this case involve, in the posture in which it

comes to us, a charitable trust, in the strict sense. The earlier cases distinguished between a devise or bequest to trustees for charitable purposes, which were often held invalid for want of definite beneficiaries and gifts inter vivos, which were usually upheld. *Book Depository v. Trustees, supra,* 117 Md. 86; *Snowden v. Crown Cork & Seal Co.,* 114 Md. 650, 80 A. 510 (1910); but see *Salem Church v. Numsen,* 191 Md. 43, 59 A. 2d 757, 4 A.L.R.2d 117 (1948). The trustees selected by Mr. Peabody, to whom he transferred the funds, caused the Peabody to be incorporated promptly for the same purposes and with the same powers conferred by him. Admittedly, the older Maryland decisions rather consistently referred to gifts to charitable corporations in support of functions within the scope of their corporate purposes as "trusts," Howard, Charitable Trusts in Maryland," 1 Md.L.Rev. 105, 121 (1937), which is imprecise because "[t]here can be no trust when the same person holds both the entire legal estate and the entire beneficial interest in the trust property." *McMahon v. St. Paul's Reformed Church,* 196 Md. 125, 132, 75 A. 2d 122 (1950).

Reduced to its simplest terms, the question before us is: Did the Peabody have the power to transfer the books? This may be answered by applying four principles, all well grounded in our prior decisions, which set up the perimeter of the powers of the Peabody trustees. A general discussion of the somewhat uncertain fashion in which the Maryland case law regarding charitable trusts developed prior to the enactment of the 1931 statutes may be found in Zollman, *American Law of Charities* §§ 42-44 (1924) at 25-27, and in an introductory note to Ch. 11 of the Maryland Annotations to the Restatement of Trusts (1940) at 230-34.

The first principle is that when property is given to a charitable corporation for such uses as are within the scope of its corporate purposes, and there was no clear intention on the part of the donor to create a trust, the gift will not be declared void on the ground that it was for indefinite purposes or in conflict with the Rule against

Perpetuities, *Gray v. Harriet Lane Home, supra,* 192 Md. at 263; *Charles T. Brandt, Inc. v. YWCA,* 169 Md. 607, 612, 182 A. 452 (1936) ; *Home for Incurables v. Bruff,* 160 Md. 156, 178, 153 A. 403 (1931) ; *Baltzell v. Church Home & Infirmary,* 110 Md. 244, 268, 274, 73 A. 151 (1909).

The second is that when a gift is made to a charitable corporation, even though it be made for a particular purpose, no condition subsequent will be implied should it prove impossible or impractical for the donee to perform the donor's condition, unless there is a clear expression of the grantor's intention that there be a gift over on default. *Hill v. Towson Realty, Inc.,* 221 Md. 389, 395, 157 A. 2d 796 (1960) ; *Gray v. Harriet Lane Home, supra,* 192 Md. at 264; *Sands v. Church of Ascension,* 181 Md. 536, 542, 30 A. 2d 771 (1943) :

> "* * * [W]hen the language of an instrument does not clearly indicate the grantor's intention that the property is to revert to him in the event it is diverted from the declared use, the instrument does not operate as a restraint upon alienation of the property, but merely expresses the grantor's confidence that the grantee will use the property so far as may be reasonable and practicable to effect the purpose of the grant.";

*Columbia Building Co. v. Cemetery of the Holy Cross,* 155 Md. 221, 229, 141 A. 525 (1928) ; *Rydzewski v. Grace Church,* 145 Md. 531, 125 A. 717 (1924) ; *Faith v. Bowles,* 86 Md. 13, 17, 37 A. 711 (1897) ; *Kilpatrick v. Mayor & C.C. of Baltimore,* 81 Md. 179, 193, 31 A. 805, 27 L.R.A. 643 (1895). Compare, however, *Mayor & C.C. of Baltimore v. Peabody Institute,* 175 Md. 186, 200 A. 375 (1938) where the testator devised certain real estate to the City on the condition that the properties be sold within five years and the proceeds used to purchase a public park. Had the devise failed, it would have passed to the Peabody under the residuary clause of the will.

The third is that this Court, lacking until recent times

statutory warrant for the application of *cy pres,* has achieved what amounts to judicial *cy pres* by a liberal construction of the provisions of the donative instrument. Examples may be found in *Loats Female Orphan Asylum v. Essom, supra,* 220 Md. at 22; *Fletcher v. Safe Deposit & Trust Co., supra,* 193 Md. at 420. See also, *Keyser v. Calvary Brethren Church,* 192 Md. 520, 64 A. 2d 748 (1949); *Gray v. Harriet Lane Home, supra,* 192 Md. at 271; Bogert, *The Law of Trusts and Trustees,* § 433 (2d ed., 1964) at 414; Restatement, *Trusts* 2d § 381 (1959) at 273.

Counsel for the Pratt and the City would have us sustain the action of the Peabody trustees under the doctrine of equitable approximation, saying that it has been adopted in jurisdictions which do not follow *cy pres* and citing *Smith v. Moore,* 343 F. 2d 594 (4th Cir. 1965); *Hardin v. Odd Fellows,* 370 S.W.2d 844 (Tenn. Ct. of App. 1963); *Tumlin v. Troy Bank & Trust Co.,* 258 Ala. 238, 61 So. 2d 817 (1952); *Manufacturers Nat'l Bank v. Woodward,* 141 Me. 28, 38 A. 2d 657 (1944); *National Bank of Greece v. Savarika,* 167 Miss. 571, 148 So. 649 (1933); *Jones' Unknown Heirs v. Dorchester,* 224 S. W. 596 (Tex. Ct. of Civ. App. 1920).

We have been referred to, and have found no Maryland case which invokes this principle nor are we inclined to apply it here, because our decisions have taken another approach. In an opinion filed for the United States Court of Appeals for the Fourth Circuit by Sobeloff, J. (formerly Chief Judge of this Court) in *Polster's Estate v. Comm'r of Internal Revenue,* 274 F. 2d 358 (4th Cir. 1960), a significant comment is found in footnote 1 at 361:

> "Although charitable trusts and their various pertinent principles have been beset with difficulties in their journey toward complete recognition in Maryland, today there are few problems about their validity, and the principle of *cy pres* has been by statute adopted in its entirety. Art. 16, Sec. 196 of the Maryland Code (1957).

> While we think it very likely that a Maryland equity court would apply the *cy pres* principle in this case, it is not necessary to decide this question, because, as we shall show, the same result, in effect has been accomplished in Maryland in case after case through a liberal construction of wills and deeds."

The reasoning of the opinion in *Polster* is grounded on *McMahon, Gray, Sands* and *Loats,* all *supra.*

Professor Scott discusses the application of liberal construction to cases of deviation in IV *The Law of Trusts, supra,* § 381 at 2987:

> "There is greater occasion for the exercise of the power of the court to permit or direct a deviation from the terms of the trust in the case of charitable trusts than in the case of private trusts, since charitable trusts may continue for an indefinite period and changes in conditions not foreseen by the settlor are therefore more likely to occur."

Appellant correctly argues that ordinarily, trustees *should* seek prior approval of the court before deviating from the precise terms of the instrument. Nevertheless, "if the court would have directed the trustees to make the application of the property which they made, it may approve the application so made." Scott, *supra,* § 399 at 3087. Thus while it is true that the chancellor was not bound to accept the solution adopted by the Peabody trustees, he did not lack the discretion to approve it, if he would have allowed the transfer in an application for authority to execute the instruments.

The final principle is that even before the enactment of Code, Art. 16, § 195, which adopted the Statute of Charitable Uses, the enforcement of gifts to corporations empowered to devote the proceeds to charitable purposes lay within the inherent power of a court of equity. Howard, "Charitable Trusts in Maryland," *supra,* 1 Md.L.Rev. at

120; *Waters v. Order of the Holy Cross*, 155 Md. 146, 142
A. 297 (1928); *Erhardt v. Baltimore Monthly Meeting*,
93 Md. 669, 682, 49 A. 561 (1901); *Hanson v. Little Sisters of the Poor*, 79 Md. 434, 438, 32 A. 1052 (1894);
*Halsey v. Convention, supra*, 75 Md. at 282; *Eutaw Place
Baptist Church v. Shively*, 67 Md. 493, 10 A. 244 (1887);
*Crisp v. Crisp*, 65 Md. 422, 427, 5 A. 421 (1886); *Barnum
v. Mayor & C.C. of Baltimore*, 62 Md. 275, 299 (1884);
Miller, *The Construction of Wills in Maryland*, § 163
(1927) at 430-33. Compare *Carter v. Mayor & C.C. of
Baltimore, supra*, 197 Md. at 83.

What powers did Mr. Peabody intend to give his trustees? A few excerpts from the letter of 12 February 1857
will demonstrate the autonomy conferred upon them.

> "In presenting to you the object I propose, *I
> wish you to understand that the details proper
> to its organization and government and its fu-
> ture control and conduct, I submit entirely to
> your judgment and discretion;* and the perpetu-
> ity of that control I confide to you and your suc-
> cessors, to be appointed in the manner pre-
> scribed in this letter."

> * * *

> "You and your successors will constitute for-
> ever, a Board of Trustees, twenty-five in num-
> ber, to be maintained in perpetual succession,
> for the accomplishment, preservation and super-
> vision of the purposes for which the Institute is
> to be established. *To you and your successors,
> therefore, I hereby give full and exclusive power
> to do whatsoever you may deem most advisable,
> for the foundation, organization and manage-
> ment of the proposed Institute. * * *"*

> * * *

> "The Trustees will make such provision out
> of the moneys I have now placed at their dis-
> posal, and out of such as I may hereafter give
> them * * * [for the support of the several de-
> partments of the Institute]; and for all proper,

contingent or incidental expenses of the Institute, in whatever branch the same may be needed. In the performance of this duty, I wish them to make a specific designation of the fund appropriated, from time to time, to each department, as well as of that for the general service of all; *and that these several appropriations be made in such proportions as the necessities of each department may require and the means at the disposal of the Trustees may allow.*" (emphasis supplied)

Nothing could be plainer than that Peabody conferred upon his trustees the broadest of discretions and the fullest of powers. At argument, it was virtually conceded that the trustees had the power to sell the books, as they had sold the Peabody collection of paintings and sculpture, or, indeed, as they might at some future date dispose of the building or sell the securities comprising the endowment of the Institute; assuming, of course, that the proceeds would be devoted to the advancement of the corporate purposes of the Institute. *Peter v. Carter,* 70 Md. 139, 16 A. 450 (1889).

If we grant that the books could have been sold, can there be any validity in the argument that the trustees lacked the power to *give* the library to another public institution under an agreement that the recipient would use the collection "in accordance with Mr. Peabody's letter of February 12, 1857"?

We think the answer is obvious. It was with reluctance that the Peabody trustees came to grips with the realities of the situation. In view of the staggering deficits being incurred by the Library, and the trustees' inability to raise funds to meet them, there were five options open to them:

(i) They could have closed the Library and sold the books, using the proceeds to support other activities of the Institute;

(ii) They could have closed the Conservatory and de-

voted the resources of the Institute to the Library;

(iii) They could have reduced the scope of the collection by selling part of it, and used the proceeds to support the smaller library which remained;

(iv) They could have deposited the Library's books in the custody of, or on indefinite loan to, some other public institution, which would have assumed responsibility for the collection, as they attempted to do with Johns Hopkins; or,

(v) They could transfer the books to some other public institution which would agree to assume responsibility for the collection, on the condition that it would be maintained in the manner envisioned by Mr. Peabody.

It seems clear to us that the Peabody selected what was, under all the circumstances, the most acceptable expedient. Instead of selling the books, they chose to transfer them to Pratt, in return for Pratt's undertaking to abide by Mr. Peabody's instructions. The exigencies of an almost identical problem were similarly resolved in *Trustees of the Watkinson Library v. Attorney General*, 16 Conn. Supp. 448 (1950), which upheld the transfer to Trinity College, on certain conditions, of a specialized library theretofore maintained as an adjunct to the Connecticut Historical Society, when a shortage of funds made the continuance of an independent entity impossible.

We are troubled, as was the chancellor, by the variance between the memorandum of understanding and the instrument of assignment and transfer. It will be remembered that Paragraph 4 of the memorandum contained the provision,

"It is understood that shortly after transfer of the collection to Pratt, Pratt may decide to dispose of some items, which based on an analysis by the Directors and appropriate staff members of the two institutions, are now considered to

be items either duplicating materials already in the Pratt collection or serving no useful purpose in the combined collection."

The instrument of assignment neither contains such a provision nor incorporates the terms of the memorandum by reference.

A possible explanation is found in the testimony of Mr. Marbury that the Peabody trustees had contemplated that Mr. Frank N. Jones, the Peabody's librarian, would advise the Peabody with regard to dispositions, but by 1 July 1966, when the instrument of assignment was executed, Jones had left, and Mr. Marbury admitted that no one remained on the Peabody staff to whom the trustees could turn for advice. Mr. Marbury went on to say that he had never interpreted the assignment as having superseded the memorandum of understanding, nor had anyone else, to his knowledge.

Judge Joseph L. Carter, who heard the case on the merits below was fully cognizant of this problem, and observed in the course of his opinion:

"* * * These are plain unambiguous provisions entered into by highly respected groups of citizens of Baltimore City, both recognizing the value of Mr. Peabody's generosity to the community and both attempting to prevent a failure of his ideals and objectives. It has been suggested, particularly by another group of prominent and highly respected citizens, who filed an Amicus Curiae brief in these proceedings, that there may be some confusion and that 'some further definition of the nature and object of the Peabody Trust appears essential.' [8] This concern is understandable and may result in fu-

[8]. Francis F. Beirne, John Dos Passos, Eli Frank, Jr., Gerald W. Johnson and H. H. Walker Lewis, who urged that "[I]f the transfer of the Peabody collection is permitted, it be upon the condition that the collection is not to be broken up for sale or incorporated into the Pratt's circulating collection but is to be administered in such a way as to preserve its basic purpose and character as a library for reference and research."

ture litigation, but really to no greater extent than if this transfer were not even under consideration. Whether the Library be under the management of the Trustees of Peabody or of the Trustees of Pratt, the question of carrying out the wishes of Mr. Peabody could be litigated; and the record clearly shows that both institutions recognize the Grantor's wishes and the terms of his Trust and wish to respect them. It would be impossible and contrary to our practice to anticipate and try to answer all problems in advance of their actual happening. In this connection, it is perfectly obvious that Peabody intends to continue to exercise supervisory control over the Pratt management of the Peabody collection. This is demonstrated by Mr. William L. Marbury's letter of December 23, 1966, to Mr. Keating Bowie * * * which in no uncertain terms points out that Peabody will see to it that the Memorandum of Understanding will be carried out in accordance with its terms. The evidence in the case and the witnesses produced in support thereof prompt me to the conclusion that the Trustees of Pratt are just as much concerned about carrying out Mr. Peabody's wishes as are the Trustees of Peabody in seeing to it that this is done."

We are inclined to agree that on the record before it, the lower court could do no more than conclude that the transfer of the books to the Pratt, subject to Mr. Peabody's instructions to his trustees, involved no breach of trust. There was not before the court below any clear-cut proposal regarding the disposition of any portion of the collection, but rather a series of recommendations by Mr. Castagna, the director of the Pratt; by Mr. Metzdorf, the Pratt's appraiser; by Mr. Greenaway and Mr. Arnold, who apparently had been retained by Pratt as consultants after this suit was instituted, no one of which would appear to have been formally adopted and none of which

appears to be clearly reconcilable with the only specific proposal, that submitted to the Ford Foundation.

We accept Judge Carter's conclusion that the trustees of both the Pratt and the Peabody are familiar with Mr. Peabody's wishes and intend to respect them. Any effort to define "the nature and object of the Peabody Trust" as suggested by the amici curiae would be inappropriate and premature at this juncture. Should there be a departure from the February, 1857 letter in the future, the power of enforcement which lay within the inherent power of the equity courts even prior to the enactment of Code, Art. 16, § 195, see *Barnum v. Mayor & C.C. of Baltimore, supra,* 62 Md. at 299, may be invoked either at the instance of the Attorney General; of one or more of the Peabody trustees, *Book Depository v. Trustees, supra,* 117 Md. at 91; *Peter v. Carter, supra,* 70 Md. at 139; Scott, *supra,* § 391 at 3006; or of another party having a special interest, *Carter v. Mayor & C.C. of Baltimore, supra,* 197 Md. at 74, 83; Scott, *supra,* § 391 at 3007-10.

Although in the context of the early cases, enforcement most frequently connotes a determination of validity, we see no reason why it could not be invoked to require the performance of an understanding reached by two public institutions.[9]

For these reasons, we shall affirm the decree dismissing the bill.

*Decree affirmed, costs to be paid by appellant.*

---

9. See Note, "The Enforcement of Charitable Trusts in America: A History of Evolving Social Attitudes," 54 U.Va.L.Rev. 436 (1968).