MAYOR AND ALDERMEN OF THE CITY OF
ANNAPOLIS ET AL. *v.* WEST ANNAPOLIS
FIRE AND IMPROVEMENT
COMPANY ET AL.

[No. 258, September Term, 1971.]

*Decided March 10, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Eugene M. Lerner, City Attorney,* for Mayor and Aldermen of the City of Annapolis, one of appellants. *Nicholas J. Fotos* for Mary W. Proskey et al., other appellants.

*Frank R. Weathersbee* and *Frank B. Walsh, Jr.,* for the West Annapolis Fire and Improvement Company, part of appellees. No brief filed on behalf of other appellees.

SINGLEY, J., delivered the opinion of the Court.

Only the most naive city dweller would find credible a rumor that a company of his city's fire department proposed to sell its firehouse and move its trucks and equipment to a new firehouse which it planned to build somewhere in the county. Yet this is precisely what has happened in Annapolis, and neither the Mayor and Al-

dermen of the City of Annapolis (the City) nor Mary M. Proskey, together with a group of nine of her neighbors and two neighborhood associations (referred to collectively as the Residents), all appellants here, have been able to stop the contemplated hegira. As is so frequently the case, it is the factual background which bridges the credibility gap.

There came a time in 1911 when the West Annapolis Fire and Improvement Company (the Fire Company) was incorporated, having no capital stock,

> "* * * the more effectually to protect the property of the Citizens of Anne Arundel County, especially that portion thereof known as West Annapolis and the territory lying adjacent and contiguous thereto, from loss and damage by fire and for the general improvement and betterment of said portion of Anne Arundel County * * *."

Less than a year later, one Elizabeth Giddings conveyed a lot at the corner of Severn Avenue and Randall Street to the Fire Company, apparently as a gift. The habendum clause of the deed provided, in part:

> "* * * that should [The West Annapolis Fire and Improvement Company] * * * cease to use said lot and the building thereon erected as headquarters for the Volunteer Fire Association, then the said lot of land shall immediately revert to the said Elizabeth Giddings."

The Fire Company built a firehouse on the lot, now known as 501 Melvin Avenue, and in 1924, purchased the adjoining lot as well as the reversionary interest reserved in the 1912 conveyance. During this entire period, and for some years thereafter, West Annapolis was an unincorporated, largely residential community, lying outside the corporate limits of Annapolis.

The next development occurred in 1951, when West Annapolis, including the area where the Fire Company

is located, was annexed by the City. In anticipation of this change, on 30 December 1950, the Fire Company leased its firehouse to the City at a nominal annual rent of $1.00, the City assuming responsibility for maintenance and repairs. The lease was for a term of one year, and automatically renewed itself from year to year. There was a further provision that the lease would terminate if the Fire Company ceased "to be an active fire fighting unit of the City of Annapolis" or ceased to "operate as such in and from the buildings and premises * * * demised." The Fire Company was not paid for the equipment which it owned at the time of the annexation. Thereafter, the Fire Company became a part of the City's fire department. There was testimony that from 1952 through 30 June 1969, the City made annual payments to, or for the account of the Fire Company for the purchase of equipment which amounted in the aggregate to $82,772.00.[1] The appropriation for the fiscal year ended 30 June 1970 was $6,334.

The City was understandably concerned when it learned in December of 1969 that the Fire Company had contracted to sell its firehouse and the adjoining lot to the Anne Arundel County Board of Education, after having previously entered into negotiations for the purchase of a site for a new firehouse, some three miles distant, outside the corporate limits of Annapolis.[2]

The residents of West Annapolis were equally concerned, but for different reasons: the firehouse had for years served as a community center and the Fire Company had been supported by the voluntary contributions of residents of the West Annapolis area, entirely from 1911 to 1951, and in large part from 1951 to 1969.

As a result, two equity suits were brought in the Cir-

---

1. Captain John W. Smith, of the Fire Company, testified that this amount represented about 25% of the expense of operating the Fire Company during the period. The balance was raised at carnivals, bazaars or suppers and from voluntary contributions.

2. At argument, we were told that the Fire Company had selected another location in Anne Arundel County about a mile and a half distant from the present firehouse. This was not in evidence in the court below, and is not before us.

cuit Court for Anne Arundel County: one by the City, which sought to impress certain of the equipment and apparatus with a trust in its favor.[3] The other suit, instituted by the Residents, sought a declaration that the assets of the Fire Company constituted a charitable trust, held for the benefit of residents of West Annapolis, and prayed that the sale of the firehouse be annulled and that the removal of the trust assets be enjoined. The cases were consolidated for trial. From decrees dismissing both bills of complaint, and from an order that the 1970 appropriation of $6,334 be paid to the Fire Company, these appeals were taken.

In a nutshell, the chancellor found no evidence that the funds paid to or for the account of the Fire Company were paid on condition that the Fire Company would not relocate or with the understanding that equipment purchased in the Fire Company's name would be treated as the property of the City, and dismissed the City's bill. Declaratory relief was denied the Residents because there was no evidence that the relocation of the Fire Company would mount up to a departure from its stated corporate purpose.

### The City's Appeal

The City argues that the court below erred, first, in not imposing a trust in favor of the city on equipment which had been paid for by the City, but titled in the name of the Fire Company; and second, in not requiring the return of $6,334 which would have been paid the Fire Company for the fiscal year ended 30 June 1970, but had been paid into court during the pendency of the litigation.

Five aldermen or former aldermen testified, and it was stipulated that the City's mayor and as many as 12 aldermen or former aldermen would testify, if called,

---

3. The equipment which the City sought to reach was engine 401, purchased in December, 1967, valued at $38,500; engine 402, purchased in January, 1962, valued at $20,500, and 7,200 feet of hose, valued at $10,630. No claim was made as regards a pumper purchased by the Fire Company in 1946.

that they would never have voted in favor of the appropriations made to the Fire Company had they known that the Fire Company was planning to move from the city and take its equipment.

The court below found as a fact that the grants had not been made subject to a condition that the Fire Company would never relocate, or that the equipment would be treated as the property of the City, and observed, "[a]n unspoken assumption on the part of the Aldermen that this would be so is not enough." There was a further finding that the annual appropriations had been made to insure that the Fire Company was properly equipped to fight fires in its area.[4] That it was an effective fire fighting unit is not disputed and thus the court concluded that the Fire Company was entitled to retain the equipment and the funds, including funds appropriated for fiscal 1969-1970, see *Rescue Fire Co. v. County Comm'rs*, 188 Md. 354, 359, 52 A. 2d 733 (1947).

Since the City was unable to prove the existence of an express trust, it can only prevail if the circumstances gave rise to an implied trust, *Springer v. Springer*, 144 Md. 465, 475, 125 A. 162 (1924).

> "Implied trusts may be either resulting or constructive trusts. A resulting trust arises upon the presumed intention of the parties where the terms of the disposition or accompanying facts establish that beneficial interest is not to go with legal title." *Siemiesz v. Amend*, 237 Md. 438, 441, 206 A. 2d 723 (1965).

And while it is true that where a purchase price is paid by one person, and title is taken in the name of another, it is presumed that the person taking title holds the property in trust for the person who paid the purchase price,

---

4. The testimony of City officials made it clear that it was impossible to establish with absolute certainty that the fire engines had been purchased entirely with City appropriations. At time of trial, some $19,000 was still owed by the Fire Company on engine 401.

> "[t]his presumption, however, does not arise where the legal title is taken in the name of some person for whom the purchaser is under a legal or moral obligation to provide. In such case the presumption arises that the conveyance was intended as an advancement to the nominal purchaser." *Dixon v. Dixon*, 123 Md. 44, 57, 90 A. 846 (1914).

Here, the bulk of the funds paid by the City to the Fire Company were paid under legislative mandate, *see, e.g.,* Ch. 718 of the Laws of 1955 and *Board v. Baden Vol. Fire Dep't*, 257 Md. 666, 264 A. 2d 844 (1970). As a consequence of the legal obligation, the presumption does not arise, and the City has the burden of proving the establishment of the trust by plain, unequivocal and convincing evidence, *Fasman v. Pottashnick*, 188 Md. 105, 109-10, 51 A. 2d 664 (1947) ; *Sands v. Church of the Ascension, Etc.*, 181 Md. 536, 30 A. 2d 771 (1943). This the City has failed to do. To the extent that funds were not required to be paid by law, they can be regarded as the discharge of a moral obligation to pay for the services of the Fire Company.

The City fares no better with its argument that a constructive trust was established.

> "Equity creates such a trust where a person holding title to a property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it. Such a trust may arise because the property was acquired through duress, fraud, undue influence or mistake, or through a breach of fiduciary duty, or through wrongful disposition of another's property. [citing cases]." *Siemiesz v. Amend, supra,* 237 Md. at 441-42.

The City's difficulty stems from the principle that a constructive trust, if it is to be established, must ordinarily

be established from circumstances surrounding the inception of the transaction, and not from the effect of subsequent events, *Corbett v. Hospelhorn,* 172 Md. 257, 275, 191 A. 691 (1937). There is not even an intimation of conditions imposed on the Fire Company, or of promises made by it, at the time money was appropriated or equipment acquired or transferred.

We think the chancellor was entirely correct in dismissing the City's bill of complaint and in directing that the 1969-1970 appropriation be paid to the Fire Company.

## The Residents' Appeal

The Residents stake their hopes on the argument that the Fire Company is a charitable corporation, that gifts to such a corporation created a charitable trust, susceptible of enforcement by ascertainable beneficiaries, and that it was beyond the Fire Company's powers either to amend the purpose clause of its articles of incorporation or to relocate its firehouse.

While we are unwilling to accept the idea that a charitable trust was created, there is no question in our minds that the case law dealing with gifts to corporations organized for charitable, educational, or religious purposes is equally applicable to gifts to a non-profit corporation, formed to advance the public good, such as a volunteer fire company which performs services usually regarded as a function of government, *see Williams v. Rescue Fire Company,* 254 F. Supp. 556 (D. Md. 1966) ; *Fire Ins. Patrol v. Boyd,* 120 Pa. 624, 15 A. 553 (1888) ; 15 Am. Jur. 2d *Charities* § 146, at 155 (1964) ; 2 Restatement, *Trusts* 2d § 373 a, at 256 (1959).

In *Sands v. Church of the Ascension, Etc., supra,* 181 Md. 536, two vestrymen had given the church bonds in an aggregate principal amount of $20,000 with a letter:

> "It is our wish that the income from these bonds be used only for the payment of the Ground Rent as it becomes due and said income is not to be used for any other purpose whatso-

ever, neither must the income of the bonds or the bonds be used to borrow money on. Further if at any time the Vestry can buy out or extinguish the Ground Rent at a price satisfactory to them, they can sell the bonds and apply the proceeds to said extinguishment of the Ground Rent. Also, if at any time the Vestry can sell the bonds and buy other securities that they may deem better or more profitable, they can do so, but must replace the securities so purchased in place of those sold."

In 1932, the church property was sold, and in 1941, an accountant found the letter. Suit was brought by the residuary legatees under the donors' wills, who contended that the bonds were impressed with a trust, and that when the church property was sold and the bonds were no longer needed for the purpose intended, a resulting trust arose in favor of the donors' estates. The Church of the Ascension's position that it was entitled to retain the bonds was upheld, both in the lower court and on appeal.

The case is a source of authority for several propositions which are apposite here: first, that an express trust cannot exist where the same person has both legal title to and beneficial enjoyment of the property, *Brandt, Inc. v. Y.W.C.A.*, 169 Md. 607, 182 A. 452 (1936); second, that where property is given to a corporation for such uses as are within its corporate powers, no trust is created, *Baltzell v. Church Home*, 110 Md. 244, 274, 73 A. 151 (1909), and finally, that in the absence of a clear reservation of a reversion, what might otherwise be construed as a condition will be regarded as the donor's expression of confidence that the property will be used for the intended purpose so far as may be reasonable and practicable, *Columbia Bldg. Co. v. Cemetery of Holy Cross*, 155 Md. 221, 229, 141 A. 525 (1928).

Later cases have refined these principles. *Inasmuch Mission v. Merc. Tr. Co.*, 184 Md. 231, 239, 40 A. 2d 506 (1945) held that the fact that a charitable institution

to which a bequest has been given is under a different
ownership and management from that which the testa-
tor knew does not work a forfeiture, especially when the
change is for the purpose of insuring continued existence.
*Gray v. Harriet Lane Home,* 192 Md. 251, 64 A. 2d 102
(1949) held that a bequest for the treatment of diphtheria
and scarlet fever patients could be used in support of
other corporate purposes when the incidence of the two
diseases declined. *Loats Asylum v. Essom,* 220 Md. 11,
150 A. 2d 742 (1959) permitted the sale of real estate
devised to a home for orphan girls, and the use of the
sale proceeds in support of girls in foster homes. *Gordon
v. City of Baltimore,* 258 Md. 682, 267 A. 2d 98 (1970)
upheld the power of the trustees of the Peabody Institute
to transfer the Institute's library to the Enoch Pratt Free
Library.

It is imprecise to characterize any gifts to the Fire
Company as creating a charitable trust: first, because
it held both legal and equitable title, and second, because
the assets of the Fire Company represent the accumula-
tion of funds given to or raised by the Fire Company in
support of its corporate purpose, *Gordon v. City of Bal-
timore, supra,* 258 Md. at 702-03; Howard, *Charitable
Trusts in Maryland,* 1 Md. L. Rev. 105, 121 (1937). Our
prior decisions make it clear that when a gift is made
to a charitable corporation, even though it be made for
a particular purpose and it proves impossible or im-
practical for the donee to perform the donor's desires,
no condition subsequent will be implied unless there is a
clear expression of the grantor's intention that there be
a gift over on default, *Gordon v. City of Baltimore,* 258
Md. at 704; *Gray v. Harriet Lane Home,* 192 Md. at 264;
*Sands v. Church of the Ascension, Etc.,* 181 Md. at 542,
all *supra.*

If there were an intimation that the Fire Company
was about to suspend operations or substantially deviate
from its corporate purpose, different considerations might
come into play, *compare Peter v. Carter,* 70 Md. 139, 16
A. 450 (1889) *with Bryan v. Board of Education,* 151

U. S. 639, 14 S. Ct. 465, 38 L. Ed. 297 (1894) and *Paterson v. Paterson Gen. Hospital,* 97 N. J. Super. 514, 235 A. 2d 487 (1967). Such is not the case, however. There was testimony that the Fire House was dilapidated and unsanitary, giving rise to complaints by the paid firemen, and that a new building in a different location might not only make possible the recruitment of badly needed volunteers but also permit the scheduling of a variety of income-producing social events. A map was admitted in evidence showing that the present location of the firehouse was at the edge of the Fire Company's first due area and of its first alarm area.[5] There was testimony that the proposed location, although in the county, and outside the first due area, was in the center of the first alarm area, and as close to about one-half of the first due area as is the present firehouse. A table was introduced showing that the Fire Company responded to far more calls in the county than it did in the city.[6] The chancellor found

> "* * * nothing in the evidence to indicate that the * * * [charter] purpose—['* * * the more effectually to protect the property of the Citizens of Anne Arundel County, especially that portion thereof known as West Annapolis and the territory lying adjacent and contiguous thereto * * *'] will not be substantially or, perhaps, better served, by the proposed relocation."

nor do we.

The Residents make much of the fact that in March 1970, some two months after suit was instituted, the Fire Company amended its articles of incorporation, rewording the purpose clause to read

---

5. A first due area is that in which a fire company is expected to be first at the scene of the fire; a first alarm area, that in which it responds to all calls.

6. In the period 1962-1970, the Fire Company responded to 2,238 calls, 60.6% of which were in the county, 8.65% of which were in West Annapolis, 4.5% of which were in Admiral Heights, and some 26% of which were in the remainder of the City of Annapolis.

"* * * to enable the members to more effectively protect the property of the citizens of Anne Arundel County, especially that portion thereof known as the Sixth and Second Assessment Districts, from loss and damage by fire * * *."

If, as we understand, the Sixth Assessment District comprises the City of Annapolis, and the Second District, that portion of the county lying generally to the west and northwest of the city, the distinction complained of is one without a difference, and is nothing more than a more prècise delineation of geographical boundaries.

*Decrees of 30 December 1970 and order of 10 February 1971 affirmed, costs in each case to be paid by appellants.*